Gregory **RESNOVER**, Appellant,

v.

**STATE of Indiana,** Appellee.

No. 182 S 21.

Supreme Court of Indiana.

March 19, 1984.

Rehearing Denied April 27, 1984.

Dawn D. Duffy, Buck, Berry, Landau, Breunig & Quinn, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Gregory Resnover was found guilty by a jury in the Marion Superior Court of conspiracy to commit murder and murder. The trial court sentenced Appellant to fifty years imprisonment for conspiracy and to death for murder. Appellant now directly appeals and raises the following eight consolidated issues for our consideration:

1. whether Indiana's death penalty statute is constitutional;

2. whether certain pretrial publicity rendered the trial court's denial of Appellant's Motion for Continuance a reversible error;

3. whether Appellant's *"Miranda"* rights were violated when the trial court allowed a police officer to testify about overhearing a certain remark by Appellant;

4. whether the trial court erred by permitting a news reporter to testify about certain admissions made to him by Appellant;

5. whether the trial court erred by permitting a jail inmate to testify about certain admissions made to him by Appellant;

6. whether the trial court erred by admitting a certain tape recording into evidence;

7. whether the trial court erred by permitting a witness to testify in alleged violation of a separation order; and

8. whether the trial court erred by sentencing Appellant to death when it was asserted that he was not the "trigger man."

The evidence adduced during trial showed that at approximately 3:00 a.m. on December 11, 1980, Indianapolis Police Sergeant Jack Ohrberg met Sergeant Lewis J. Christ to serve papers on certain individuals believed to be at 3544 North Oxford Street in Indianapolis. Sergeant Ohrberg and Christ subsequently were joined by other officers before arriving at the duplex residence at 3544 North Oxford at approximately 5:30 a.m. With Officers Schneider and Harvey standing watch in the rear, Ohrberg, Christ and Officers Ferguson and Foreman proceeded to the porch and front door. Foreman and Ferguson were in uniform. Ohrberg knocked loudly several times and identified himself as a police officer. He then went to 3546 North Oxford, the adjacent other half of the double residence, and checked with Sandra Richardson to ascertain whether any persons were known to be inside the 3544 address. Richardson told Ohrberg that she had heard noise come from 3544. Ohrberg returned to 3544 and again pounded on the front door and announced himself as a police officer. Ohrberg then assumed a crouched position and started to use his right shoulder to batter the door which, after a few hits, began to open. Ohrberg continued to hit the door placing his body partially inside the door. Foreman was shining a flashlight over Ohrberg's head since it was dark inside the residence and Foreman wondered why the front door would not fully open. Looking inside the house, Foreman saw some furniture blocking the door. Sergeant Christ also saw the furniture. As Foreman looked inside, he suddenly saw a burst of muzzle flashes and heard two, possibly three, shots in quick succession. The simultaneous muzzle blasts came from two separate locations approximately eight to ten feet apart. Christ also heard shots emanate from inside the residence. Ohrberg said: "Oh, no, I've been shot" or "I've been hit" and then stepped back two steps, sank to his knees and collapsed on the porch. Taking cover, Christ saw a person with an "Afro" type hairstyle emerge from the dark doorway onto the porch and fire at least two additional shots into Sergeant Ohrberg. Shots also were being rapidly fired from within the residence. When Christ returned the gunfire, the man on the porch quickly retreated inside the building. Ferguson also saw the person stand over Ohrberg and fire his rifle into Ohrberg. Ferguson specifically testified that he could see the muzzle flash as the rifle was fired. Ferguson fired at the gunman and then ran around the corner of the house where gunfire continued to be directed at him. After more shooting, a man identifying himself as "Gregory" called from inside the house and said "Let's talk." "Gregory" stated that there was an injured man inside and offered to send out the two women occupants. Christ refused to accept the women and ordered "Gregory" outside. "Gregory" then said that he would come out whereupon he stepped to the door, threw a weapon out into the front yard and walked onto the front porch with his hands raised. Christ identified this man as Appellant Gregory Resnover and identified an AR–15 rifle as similar to the weapon Appellant threw into the front yard. Ferguson also identified the man as Gregory Resnover.

Earl Resnover subsequently followed Appellant out onto the front porch where he laid down an AR–15 rifle and a Smith and Wesson revolver. Two women lastly walked out of the house leaving wounded Tommy Smith alone in the building. Foreman testified that the four came out of the house approximately ten to fifteen minutes after the initial burst of gunfire.

Forensic pathologist Dr. James A. Benz performed an autopsy on the body of Jack Ohrberg. Benz testified that Ohrberg died as a result of multiple gunshot wounds. He specifically testified that one bullet perforated Ohrberg's abdominal wall and external iliac artery and completely severed his iliac vein. Another shot lodged in the soft tissues of Ohrberg's back after fracturing parts of two vertebrae. A third shot entered his left side, fractured his tenth rib and bruised his lung. There were 600 mililiters of blood in Ohrberg's abdominal cavity.

The weapons thrown into the front yard or left on the front porch were collected by Russell Bartholomew, a crime lab technician. Bartholomew testified that the weapon thrown down by Appellant was an AR–15 automatic rifle with live rounds. The weapons on the porch were another loaded AR–15 and a loaded .38 caliber Smith and Wesson revolver. Evidence technician Cosmos Raimondi recovered weapons, ammunition clips, bullets and shell fragments from inside the house after it was secured by police. Raimondi testified that he found:

—one AR–15 rifle without clip but with one live round chambered; the rifle's clip was located nearby damaged but containing twenty-five live rounds;

—one .30 caliber Universal carbine with one round chambered and a clip containing twenty-five rounds;

—one rifle clip concealed in a bathroom light fixture;

—one Mauser 7.65 automatic pistol recovered from underneath the front room sofa with one round chambered and one five round clip;

—fifteen spent shell casings recovered from the front room and kitchen;

—twelve live Smith and Wesson rounds for a .38 caliber Special pistol;

—one .223 ammunition clip with twenty-five live bullets discovered hidden underneath the front sofa;

—another .223 ammunition clip with twenty-six live bullets;

—one ammunition pouch with seven live automatic bullets found underneath a cushion on the front sofa;

—fifteen Smith and Wesson Specials and one WW .38 Special found lying loose on a coffee table;

—one Memorex casette box with fifteen live .38 caliber bullets;

—one AR–15 clip with thirty live .223 caliber bullets discovered in the rear bedroom; and

—one black shaving case containing one knife, one empty Colt AR–15 clip, one ammunition clip possibly for a M–1 carbine and two hearing protectors.

The AR–15 recovered from the front porch bore Appellant's fingerprints on the ammunition clip. Although this gun had fired eight of the recovered shell casings, it did not fire the bullet recovered from Ohrberg's body. The AR–15 found inside the house with its broken clip located nearby fired the bullet retrieved from Ohrberg's body. The broken clip appeared to have been dented by a bullet.

Crime lab technician Robert McCurdy testified that he performed atomic absorption tests on swabbings taken from the arms of Appellant and Tommy Smith. Appellant's right arm had significantly higher amounts of barium and antimony, components of modern ammunition primer, indicating his handling or firing of a gun. The tests conducted on the swabbings taken from Appellant's left arm were inconclusive. McCurdy also recovered from Earl Resnover a billfold containing Sergeant Ohrberg's business card.

## I

Appellant raises several issues attacking the constitutionality of our death penalty statute, Ind.Code § 35–50–2–9 (Burns Supp.1983). We have considered and disposed of these issues on numerous occasions and will not go into them again at great length in this opinion. *See Schiro v. State*, (1983) Ind., 451 N.E.2d 1047, *cert. denied* — U.S. —, 104 S.Ct. 510, 78 L.Ed.2d 699; *Williams v. State*, (1982) Ind., 430 N.E.2d 759, *appeal dismissed* 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47; *Brewer v. State*, (1981) Ind., 417 N.E.2d 889, *cert. denied* 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384; *Judy v. State*, (1981) Ind., 416 N.E.2d 95.

■ Appellant first claims that Indiana's death penalty is cruel and unusual punishment which violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, section 16, of the Indiana Constitution. We have held that Indiana's death penalty statute is constitutional. *Schiro, supra; Williams, supra; Brewer, supra; Judy, supra.* The United States Supreme Court similarly has held that the death penalty does not *per se* violate the Eighth or Fourteenth Amendments to the United States Constitution. *Jurek v. Texas*, (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Proffitt v. Florida*, (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Gregg v. Georgia*, (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. Appellant's first claim accordingly is without merit.

■ Appellant next claims that our death penalty statute is unconstitutional since it fails to provide meaningful standards to guide the jury. Ind.Code § 35–50–2–9 requires that a jury specifically find at least one statutory aggravating circumstance as a prerequisite to recommending a death penalty and, in addition, the jury must determine that all mitigating circumstances are outweighed by any aggravating circumstances. Appellant points to three United States Supreme Court opinions to suggest that death sentences may not be imposed in cases with no standard to guide the jury or when the standards are so vague that arbitrary and capricious sentencing could occur. *Godfrey v. Georgia*, (1980) 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398; *Woodson v. North Carolina*, (1976) 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; *Proffitt, supra.* This Court repeatedly has held that Indiana's death penalty statute establishes definite standards by which Indiana juries are given adequate and specific guidance. Said standards are consistent with those set out by the United States Supreme Court in *Godfrey, Woodson* and *Proffitt*. In *Proffitt*, the United States Supreme Court authorized a death penalty when, after a bifurcated hearing, the jury considered whether sufficient mitigating circumstances existed to outweigh the exigent aggravating circumstances. We approved the same statutory standards and protocol in *Schiro, Williams, Brewer*, and *Judy*. In *Eddings v. Oklahoma*, (1982) 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, the United States Supreme Court declined to instruct a state court on how to weigh mitigating evidence since the state court considered all relevant mitigating evidence, attributed some modicum of weight to said mitigating evidence and balanced it against the evidence of aggravating circumstances. Our statute requires the jury to find that the State proved the existence of at least one aggravating circumstance beyond a reasonable doubt and weighed that aggravating circumstance against any mitigating circumstances which existed. Our statute therefore adequately protects a capital defendant's right to be sentenced in a manner which is not arbitrary, freakish or capricious.

■ As the State indicates, the trial judge in this case afforded Appellant more protection than required and all of the protection which Appellant argued he was entitled to. The trial judge specifically instructed the jurors that they must be convinced beyond a reasonable doubt that the alleged aggravating circumstances existed. The trial judge then gave Final Instruction 27 which directed that before returning a

recommendation of death, the jury must be "further convinced by the evidence beyond a reasonable doubt, that any mitigating circumstances that existed are outweighed by the foregoing aggravating circumstances." We find that our law adequately provided proper standards and guidelines to be followed when applying the death penalty and that the trial court observed these standards and guidelines and directly and specifically instructed the jury as to the way in which they were to apply these standards and guidelines. Furthermore, the record shows that Appellant elected to present no evidence of mitigating circumstances and insisted on being tried *in absentia* during the penalty phase. We find no error on this issue.

Appellant argues that because a prosecutor has the sole discretion to file or not file a capital punishment count, that officer determines the ultimate application of the death penalty thereby precluding the consistency and fairness required by *Gregg* and *Proffitt*. *Schiro* and *Williams* adversely decided this contention by holding that there is no constitutional provision prohibiting prosecutorial discretion in charging the death penalty. *Gregg* explicitly held that no constitutional right was violated by a prosecutor exercising unfettered authority to select those persons to prosecute for a capital offense. *Proffitt* and *Jurek* also rejected Appellant's argument holding that such a contention fundamentally misinterprets prior case law. *Schiro* and *Williams* held that there is no violation in a prosecutor's broad discretionary power to pursue a capital offense prosecution because our law has numerous means to protect against execution of arbitrary and capricious sentences of death. *See also Rowan v. State,* (1982) Ind., 431 N.E.2d 805, *reh. denied.* We previously have concluded and do now conclude that such prosecutorial discretion is permissible where, as in Indiana, a subsequent procedure dictated by statute prevents the arbitrary and capricious infliction of a death penalty. We find no error on this issue.

Appellant next claims that this Court has failed in its duty to provide special rules for the review of death sentences. Appellant's argument rests upon an unsupported assertion that the Legislature never intended the death penalty statute of 1977 to become effective unless and until this Court adopted special rules specifically pertaining to its review of death sentences. This Court already has decided this issue by holding that existing Supreme Court rules already appropriately provide for the meaningful appellate review of every death sentence. *Schiro, supra; Williams, supra; Brewer, supra.* In *Williams,* this Court noted that our review procedure is automatic, expeditious and involves a consideration of the entire record including all written findings and the factual findings required to justify that death is appropriate to the particular offender and offense. In *Brewer,* we found that our statute and our rules fulfill the *Gregg* requirements for meaningful appellate review. Moreover, our statute is nearly identical to Florida's which already had been approved by the United States Supreme Court. In *Proffitt,* the United States Supreme Court noted that capital sentences in Florida were conscientiously reviewed by the Florida Supreme Court who, having statewide jurisdiction, can assure consistency, fairness, rationality and an even-handed operation of state law such that death will not be wantonly or freakishly imposed. It was enough for the United States Supreme Court that the Florida high court had announced in one of its opinions that its function in capital cases was to insure that the reasons justifying death in one case will reach a similar result in another case under similar circumstances. *See State v. Dixon,* (Fla.1973) 283 S.2d 1, *cert. denied* (1974) 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295. It is the practice of this Court to meaningfully, if not systematically, review each case involving a death sentence with regard for all other Indiana death penalty cases so as to insure the consistent, fair and even-handed operation of Ind.Code § 35-50-2-9. In *Lowery v. State,* (1982) Ind., 434 N.E.2d 868, *reh. denied,* this

Court held that a condemned appellant is entitled to a fully adversarial process with appellant's counsel marshalling all arguable points in behalf of mercy for his client. Pursuant to *Judy*, this appellate advocacy would permit, if not require, that appellate counsel find and direct this Court's attention to all prior cases in Indiana or elsewhere in which death penalties were imposed under similar factual circumstances. Such cases would show this Court that imposition of death in the case under review might be inconsistent, freakish, arbitrary, wanton or unjustified under those particular factual circumstances. Our procedure thereby makes our consideration of any comparable cases inevitable. By the same token, our procedure shows that effective assistance of counsel is not obviated by any dearth of rules since appellate counsel readily can find reported non-capital murder cases to use for argument. We previously have pointed out that since this Court has state-wide jurisdiction to continuously and exclusively review all criminal cases involving the death penalty and prison sentences in excess of ten years pursuant to Ind.R.App.P. 4(A)(7), no death sentence will be freakishly or capriciously applied in Indiana. In addition, Ind.R.App. Rev.Sent. I and II dictate certain guidelines for the review of all sentences by this Court. Ind.Code § 35–4.1–4–3 [§ 35–50–1A–3 (Burns 1979) (replaced by § 35–38–1–3 (Burns Supp.1983) effective September 1, 1983] provides that the trial court must always submit a record of its findings indicating all aggravating factors justifying the imposition of a death sentence. This requirement guards against the influence of any improper factors at the trial level and assures that the evils of an arbitrary and capricious application of the death penalty do not attend the sentencing decision. *See Furman v. Georgia*, (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. This statute also facilitates meaningful appellate review by requiring that the entire record of proceedings including the record of the sentencing hearing is before this Court. *Schiro, supra; Brewer, supra; Judy, supra*. As we stated in *Schiro*, our examination of the complete record including the record of the trial court's findings of aggravating circumstances protects each individual's constitutional rights. We therefore find no constitutional infirmities latent in Indiana's death penalty statute nor in the review which automatically follows the imposition of a death sentence in Indiana.

■ Appellant further complains that one of the aggravating circumstances upon which the State based its request for the death penalty in his case is illegal. The allegedly illegal aggravating circumstance is established by Ind.Code § 35–50–2–9(b)(6) which provides:

"The victim of the murder was a corrections employee, fireman, judge or law-enforcement officer, and either (i) the victim was acting in the course of duty or (ii) the murder was motivated by an act the victim performed while acting in the course of duty."

Appellant now argues that section 9(b)(6) violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, section 16, of the Indiana Constitution. Appellant specifically argues that the circumstance established by Ind. Code § 35–50–2–9(b)(6) justifies a death sentence which is grossly disproportionate to the severity of punishment justified for murder since said standard of aggravation does not require that the murderer know of his victim's special status when committing the murder. The State's contention is well-taken that Appellant is not in a position to raise this issue since the facts adduced at trial clearly show that Appellant and the men inside 3544 North Oxford knew that the men at their door were police officers when they commenced firing upon them. As a matter of fact, Appellant does not allege in his brief that he did not know that Ohrberg and the others were police officers. The evidence showed that Appellant and Earl Resnover previously had encountered Ohrberg when Ohrberg indicated to them that his police investigation would likely involve them. Ohrberg's business card containing his wife's name handwrit-

ten on it was found in Earl Resnover's possession. The evidence further showed that Appellant was in a small apartment with a tremendous quantity of guns and ammunition. The neighbor in the adjoining apartment testified that when Ohrberg announced himself as a police officer and demanded entry, she heard someone in the adjoining apartment shout: "the mother fucking police." There ensued a commotion heard by the neighbor as the men barricaded themselves inside the apartment by placing a large chair against the door. Ohrberg announced himself again, pushed in the door and tried to get past the chair. He was shot. The person who stepped outside and shot Ohrberg two additional times as he lay on the porch fit Appellant's description. The evidence clearly indicates that Appellant and the others knew that they were shooting at a police officer and there is a strong inference that they knew exactly which police officer it was. Furthermore, Chief McAtee and Lt. Strode testified that Ohrberg was acting in the course of his duty as a police officer at the time when he was shot and killed. There is no merit to this issue.

## II

Appellant next claims that the trial court committed reversible error by denying his Motion for Continuance alleging unduly prejudicial pretrial publicity. Appellant initially obtained a change of venue from Marion County but later moved on May 27, 1981, to have his cause returned to Marion County. The same was done. The trial court subsequently set oral arguments on all pending motions for June 15, 1981, with trial to commence on June 19, 1981. At the June 15th hearing, Appellant's Motion for Continuance due to prejudicial publicity was orally made. The trial court responded by ordering Appellant's trial counsel to file such Motion in writing and the matter was taken under advisement. The record does not reveal whether Appellant ever filed any written motion for continuance. The record also does not show what type of publicity was involved. Appellant never indicated in his brief what type or amount

of prejudicial publicity was involved except to say that there was "a lot of it." Appellant never suggested the content of the allegedly prejudicial publicity. Newspaper reporter Scott Miley testified that an article about the instant crime was published on June 7, 1981, resulting from Appellant's request to Miley that he come to the jail to interview him on that date. We therefore find that the pretrial publicity during the month before Appellant's trial was at least partially due to Appellant's direct instigation. We find no showing that any newspaper publicity during the month preceding Appellant's trial was anything more than a rendition of fact.

It is well-settled that the granting of a continuance lies within the sound discretion of the trial judge who will be reversed only when a clear abuse of that discretion is indicated. *Caccavallo v. State*, (1982) Ind., 436 N.E.2d 775; *Collins v. State*, (1982) Ind., 431 N.E.2d 802. To demonstrate an abuse of discretion, a defendant must show that he suffered prejudice. *Downer v. State*, (1982) Ind., 429 N.E.2d 953. Appellant relies upon *Williams v. State*, (1979) 270 Ind. 426, 386 N.E.2d 670, *reh. denied*. We held in *Williams*, however, that jurors did not have to be totally ignorant about the facts involved in a case for there to be a fair trial. To insure that a fair trial is afforded every defendant, the trial court must apply to each prospective juror the standard of whether that prospective juror can lay aside his or her impressions or opinions and render a verdict based solely on the evidence presented in court. *Irvin v. Dowd*, (1961) 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. In this case, each juror indicated that he or she could lay aside any impression or opinion that he or she might have gained from reading articles about the case.

The State contends that to overcome the presumption that the jurors' *voir dire* testimony was truthful and that they therefore could render a fair and impartial verdict, Appellant must establish the existence of a general atmosphere of prejudice

throughout the community. *See Irvin, supra; Williams, supra; Mendez v. State,* (1977) 267 Ind. 309, 370 N.E.2d 323. Here there is no showing or inference that the jurors were exposed to publicity of a prejudicial or inflammatory nature. Of the eighty prospective jurors, only six expressed any lack of confidence in their ability to render an impartial verdict. All of those six were excused and did not serve on the jury. Appellant has shown no abuse of discretion in the trial court's denial of his oral Motion for Continuance. We accordingly find no error on this issue.

### III

Appellant next alleges a *Miranda* violation. *See Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Indianapolis Police Officer David Hunt drove the wagon used to transport Appellant and Earl Resnover from the murder scene to police headquarters. Said wagon had a clear glass window separating the prisoner's compartment from the driver's compartment. An inter-com mechanism was mounted in said glass partition and was not concealed but was clearly marked "Phillips Inter-Com." It was standard police procedure when transporting prisoners in the police wagon to turn the inter-com on so that talk in the prisoner's compartment could be heard by the driver. This procedure was intended to protect the prisoners in the event someone became ill, got into a fight or tried to injure himself. While listening to the inter-com with both Appellant and Earl Resnover situated in the prisoner's compartment, Officer Hunt heard Appellant say: "Beautiful shot. Blowed him away." Hunt then heard laughing and "cutting up" in the rear section. The evidence shows that neither prisoner placed into the police transport wagon had been given any warnings with respect to their constitutional rights. The evidence also shows that no one questioned them. Appellant's statement clearly was voluntarily made.

The requirements of *Miranda* do not apply beyond the inherently coercive custodial interrogation for which they were designed. The United States Supreme Court has held that the "interrogation" conceptualized in its *Miranda* opinion must reflect a measure of compulsion above and beyond that inherent in custody itself. Any statement made freely, voluntarily and without any compelling influence is admissible into evidence. *Rhode Island v. Innis,* (1980) 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297; *Roberts v. United States,* (1980) 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622. *Innis* further held that *Miranda* applies only to words or actions by police officers which the officers should have known were reasonably likely to elicit an incriminating response. The officer in the instant case did not say or do anything to elicit from Appellant an incriminating response. Appellant's statement was uncoerced. We therefore find no *Miranda* violation and hold that Officer Hunt's testimony about the remark he overheard Appellant make was admissible into evidence.

### IV & V

Appellant further alleges that the trial court erred by admitting certain testimonial evidence by a news reporter and fellow jail inmate to whom Appellant had made incriminating admissions. Scott Miley was a newspaper reporter who interviewed Appellant in jail at Appellant's request. Gregory Johnson was a fellow jail prisoner. Appellant now claims that the admission of the testimonies of these two witnesses violated his Sixth Amendment right to assistance of counsel. He cites *United States v. Henry,* (1980) 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115, which held that the Sixth Amendment is violated when the government deliberately elicits incriminating statements from an indicted prisoner through an undisclosed government agent. The Sixth Amendment violation found in *Henry* was that the witness, who already had been engaged by the Federal Bureau of Investigation as a paid informant to collect information from fellow jail inmates, was explicitly directed to collect information from the accused without

directly questioning him. The United States Supreme Court justified its majority opinion by determining that the government's action intentionally created a situation likely to induce the accused to make an incriminating statement without the assistance of counsel. There was no similar government action in the instant case.

There is no showing in the instant case that either Miley or Johnson were acting by prearrangement as government agents. Miley went to the jail at Appellant's request and interviewed him only after honestly stating that his sole purpose in visiting was to write a newspaper article. Everything that Miley testified about in court was reported in an article written by Miley and published in *The Indianapolis Star* on June 7, 1981. Miley was not directed or encouraged by the State to act as its agent and Miley did not purport to be a fellow inmate or otherwise misrepresent his status to Appellant. Miley did not inform police or the jury about any confidential information. There was no error in allowing Miley to testify about the contents of his conversation with Appellant.

■■■ Johnson testified about a conversation he had with Appellant while together in a courtroom holding cell during the afternoon after Ohrberg's murder. Johnson specifically testified about certain admissions made to him by Appellant regarding his part in the shooting of Ohrberg. There is no allegation that when Johnson talked with Appellant, Johnson had any function as a government agent nor that he was encouraged in any way by the government to get information from Appellant. The evidence shows that Johnson approached the jail officers and related to them that he had gotten information about the Ohrberg murder and wanted to use that information to strike a plea bargain for himself with the prosecutor. Johnson's selfish intention was brought out during his testimony to appropriately inform the jury. Since there is no showing that Johnson was acting as an agent for the State when Appellant voluntarily made his admissions to him, there was no Sixth Amendment violation and the

trial court did not err by allowing Johnson's testimony into evidence.

## VI

Appellant also claims that the trial court erred by allowing into evidence a tape recording of certain police radio communications relating to the instant murder. Appellant specifically objects to said tape recording citing *Lamar v. State*, (1972) 258 Ind. 504, 282 N.E.2d 795. *Lamar* provided that when the reproductive quality of a tape recording is so poor that it is difficult for a jury to discern what was said by those recorded and there is a chance that a misinterpretation might be made, the jury should not be permitted to hear the recording. Appellant's objection to the recording in question, however, does not go to the recording's reproductive quality. He admits that a transcription of the tape recording was provided to the jury and that those listening to the tape could hear and understand what the recorded parties were saying. Appellant's objection instead pertains to the fact that one could not easily determine by listening to the tape who was speaking as the parties used identification numbers and police radio codes.

■■■ The State indicates that this Court has held that to be admissible, a tape recording need only be of such clarity that, when taken as a whole, it does not lead the jury to speculate about its content. *Hestand v. State*, (1982) Ind., 440 N.E.2d 1121; *Pettit v. State*, (1979) 272 Ind. 143, 396 N.E.2d 126. We also have held that trial courts possess wide discretion to determine whether audio recordings are of such clarity as to be "intelligible and enlightening to the jury." *Winningham v. State*, (1982) Ind., 432 N.E.2d 24 (quoting from *Lamar, supra*). The fact that testimony is required by a qualified person to identify those speaking in a recording and to explain the jargon or radio codes used does not make the recording inadmissible *per se*. The rule regarding tape recordings should be the same as the rule pertaining to photographs. A photograph introduced as a true representation of what it purports

to depict is admissible even though a witness is needed to identify the people or things thereby depicted. *Wiles v. State,* (1982) Ind., 437 N.E.2d 35, *reh. denied.* The State correctly argues that an x-ray photograph is admissible into evidence although it is difficult, if not impossible, for an untrained viewer to interpret what it shows and the photograph must be explained to the jury. The individual officers whose radio calls were recorded on the tape now at issue were identified when they used their distinctive identification numbers. The numeric radio codes also were distinctive and clearly stated throughout the tape recording. The trial court therefore did not abuse its discretion by permitting the jury to hear this tape recording.

### VII

Sergeant William Burgess was not a witness during the initial or guilt determination phase of Appellant's trial. Although there was a standing separation order during Appellant's trial, the prosecution informed Burgess that said order did not apply to him since his name was not on any of the witness lists pertaining to the guilt phase of Appellant's trial. Burgess accordingly was present in court during the taking of certain guilt phase testimony. Burgess subsequently was called by the State to testify during the penalty phase of Appellant's trial. The prosecutor appropriately informed the trial court that Burgess was listed as a witness for said subsequent proceeding and would be kept from the courtroom during the penalty phase except for when he was personally testifying. The trial court ruled that since Burgess was not a witness for the State's case-in-chief during the guilt phase of Appellant's trial, his presence during some of the guilt phase proceedings did not violate the separation order. The trial court permitted Burgess to testify during the penalty phase.

The enforcement of a separation of witness order is discretionary with the trial court. Moreover, the trial court has the discretionary authority to allow a witness to testify even though that witness may have violated a separation order. The trial court's ruling will not be disturbed absent a showing that the trial court manifestly abused its discretion. *Brannum v. State,* (1977) 267 Ind. 51, 366 N.E.2d 1180, *reh. denied.* Appellant makes no showing to support his contention that he was prejudiced by the trial court's ruling in the instant cause nor does he state any facts to support his bare assertion that the trial court abused its discretion by permitting Sergeant Burgess to testify. We find no error on this issue.

### VIII

Finally, Appellant argues that *Enmund v. Florida,* (1982) 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, precludes his execution for the murder of Jack Ohrberg since he was not a "trigger man." The United States Supreme Court exercised its jurisdiction over the *Enmund* case to decide whether a death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution when imposed upon one who personally did not take a life, attempt to take a life or intend to take a life. The defendant in *Enmund* was a "getaway car" driver whose confederates robbed and killed an elderly farm couple. The defendant apparently never left the car and therefore was not present when the victims were actually confronted or "when the plan to rob the elderly couple led to their being murdered." The Supreme Court held that since the record did not show that the defendant intended to participate in or facilitate a murder, his culpability for the murder perpetrated by his confederates was different than that of his confederates. Finding justice in punishing more severely one who intentionally causes harm than one who unintentionally causes harm and finding that the death penalty has no proper purpose when imposed on one who never intended to kill, the Supreme Court held that to punish the defendant and his confederates alike by making the defendant vulnerable to the death penalty by his confederate's actions would

violate the Eighth Amendment. *Enmund* therefore dictates the rule that although vicarious liability for crimes perpetrated by one's confederates can justify one's conviction for said crimes, the imposition of death upon a vicariously guilty defendant must be based on "*his* culpability, not on that of those who committed the robbery and shot the victims, for [the United States Supreme Court] insist[s] on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" *Enmund,* 458 U.S. at 798, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152 (quoting *Lockett v. Ohio,* (1978) 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990); *See also Woodson, supra.* The *Enmund* court specified that "For purposes of imposing the death penalty, [the defendant's] ... punishment must be tailored to his personal responsibility and moral guilt." *Enmund,* 458 U.S. at 801, 102 S.Ct. at 3378, 73 L.Ed.2d at 1154.

Notwithstanding Appellant's arguments, the facts of Appellant's case in no way compare to the facts considered by the United States Supreme Court in *Enmund.* In the first place, Appellant directly participated in shooting at the police such that his personal responsibility and moral guilt are very apparent. Secondly, the jury could have found that Appellant was in fact the "trigger man" or one of the "trigger men" who directly caused Ohrberg's death. The facts clearly show that Appellant fired an AR–15 automatic rifle at Ohrberg when he was attempting to enter the apartment. Though the particular AR–15 automatic rifle which Appellant gave up when he surrendered to police may not have fired the fatal shot, the AR–15 which fired at least one of the fatal shots was found at the location where Appellant had been firing. While Appellant was in the police transport wagon after his arrest, he bragged about the "beautiful shot" that "blowed him away." Appellant admitted to a newspaper reporter that he helped to reload the guns fired at the police and was firing at the police when Ohrberg was fatally shot. Appellant's fingerprints were found on the ammunition clip belonging to and lying near the AR–15 that fired the bullet retrieved from Ohrberg's body. Appellant told a fellow jail inmate that he fired the shot which killed Ohrberg. We certainly do not find that Appellant neither took a life, attempted to take a life nor intended to take a life. We instead find that Appellant's criminal culpability was at least equal to that of the other men in the apartment, one or all of whom caused Ohrberg's death. There is, therefore, no merit to Appellant's contentions regarding this issue.

■ Finding no error after having considered all of the issues raised by Appellant, we now examine whether the death sentence is appropriate in Appellant's case. The trial judge made detailed and written findings pursuant to Ind.Code § 35–50–2–9 to facilitate our review. Among said findings, the trial judge specifically found that the jury convicted Appellant of murder and recommended the death penalty. He further found beyond a reasonable doubt that Appellant knowingly and intentionally murdered a police officer who was known by Appellant to be engaged in the performance of his official duties. According to the facts as stated above, we now find that the trial judge was justified in finding this aggravating circumstance in Appellant's case.

■ The trial judge also carefully considered on the record all possible mitigating circumstances in Appellant's case. He specifically found beyond a reasonable doubt, however, that Appellant had a significant history of prior criminal conduct including several felony convictions. The trial judge also found no fact whatsoever in Appellant's case which indicated that Appellant acted under extreme or emotional duress when he committed the instant murder. The judge also found no evidence indicating that the victim in any way participated in his murder or consented to being murdered by Appellant. The judge further explicitly found that Appellant participated in Ohrberg's murder in a major and substantial way. The trial judge specifically determined that Appellant used the deadly

weapons which he and his accomplices had stockpiled in their residence to murder Ohrberg. Appellant was found not to have been under the substantial domination of another person but rather to have acted willingly and with a reckless disregard for life. The trial court therefore concluded that there were no mitigating circumstances in Appellant's case. We agree with all of the findings of the trial judge as we find the record to indicate a total lack of any mitigating circumstances.

In reviewing Appellant's sentence, the trial court found no evidence to show that Appellant failed to appreciate the criminality of his conduct or was unable by reason of any mental disease or defect to conform his conduct to the requirements of law. The trial judge specifically found beyond a reasonable doubt that Appellant knowingly participated in the murder of a police officer who was in the performance of his official duty. The trial judge found, based on the record and his knowledge of Appellant, that Appellant had sustained an intent to violate the law while motivated to not conform his conduct to any of society's minimal requirements. The trial judge concluded that the proper sentence for Appellant was death by electrocution.

The record shows that Appellant did, in fact, take a substantial part in the shooting at police officers which resulted in Sergeant Jack Ohrberg's death. The record clearly shows that Appellant knowingly and intentionally participated in this criminal activity which caused the death of a police officer who was serving in an official capacity. We therefore find and now hold that the death penalty as provided for by our statutes was not arbitrarily or capriciously imposed upon Appellant and is reasonable and appropriate in Appellant's case.

The trial court is affirmed in all things including its imposition of the death penalty upon Appellant. This cause is accordingly remanded to the trial court for the sole purpose of setting the date when Appellant's death sentence is to be carried out.

GIVAN, C.J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.