Cindy Lou LANDRESS, Appellant,

v.

STATE of Indiana, Appellee.

No. 45S00–8911–CR–837.

Supreme Court of Indiana.

Oct. 15, 1992.

# 939

James F. Stanton, Crown Point, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

KRAHULIK, Justice.

Cindy Lou Landress was found guilty by a jury of "felony murder", *Ind. Code* § 35–42–1–1(2), in connection with the death of Leonard Fowler during a robbery. The jury also recommended the death penalty. Landress was sentenced to death pursuant to *Ind. Code* § 35–50–2–9. In this direct appeal pursuant to Indiana Rules of Appellate Procedure 4(A)(7) and *Ind. Code* § 35–50–2–9(h), Landress does not challenge the jury's determination of guilt, but presents several issues challenging the imposition of the death penalty.

We believe that one issue is dispositive and conclude that the evidence is insufficient to find, beyond a reasonable doubt, that Landress had the intent to kill required to impose the death penalty.

## Facts

The evidence relevant to this appeal is as follows. In the early hours of April 23, 1988, Landress and Lewellen were driven to the home of Lewellen's parents by Lewellen's daughter, Julie. Julie testified that when Lewellen returned to the car from the house, he showed Julie and Landress a butterfly knife. Landress said, "That's nothing, look at this," and showed them a buck knife. Landress indicated that she and Lewellen planned to go "rolling". Julie understood this to mean that they were going to knock someone out and take that person's money. On instructions from Landress, Julie stopped the car near Leonard Fowler's home where Landress and Lewellen got out. Landress told Julie not to tell anyone what she had seen or heard that evening. At trial, Julie identified the buck knife, one of the knives found at the murder scene, as the one Landress had shown her. Lewellen was found in possession of the butterfly knife at the time he was arrested.

Landress testified that after being dropped off, she proceeded to Fowler's home where she was living at the time. She was awakened by Fowler at about nine o'clock in the morning on April 23 when Lewellen arrived. Landress got out of bed and began talking and drinking with Lewellen and Fowler in the kitchen. She testified that Lewellen suddenly threatened Fowler with a knife and forced Fowler to lie face down on the floor. Following Lewellen's instructions, Landress brought an extension cord and suspenders, which Lewellen used to tie up Fowler. Lewellen removed Fowler's wallet and handed it to Landress.

Landress went into the kitchen with the wallet, removed the money from it, and urged Lewellen to leave the house with

her. At that point, she observed that Fowler had escaped and was in his bedroom loading his shotgun. When she told Lewellen of this development, he ran to the bedroom and began stabbing Fowler. Landress attempted to break up the fight, but was unable to do so. She obtained a knife from the kitchen and returned to the bedroom. She testified that she did not rejoin the struggle, but dropped the knife in the doorway. Her intent was to stop the fight between the two men. At some point, Landress received a deep cut to the palm of her hand. Lewellen then announced that Fowler was dead, and instructed Landress to take the keys to Fowler's truck. Landress removed the keys from a front pocket of Fowler's pants, and the two left Fowler's home in his truck. Eventually they made their way to California where they were captured approximately two weeks later.

Leonard Fowler was found dead in his home. His death was caused by multiple stab wounds to his abdomen which severed a large artery, causing him to bleed to death. One knife blade, separated from the handle, and two knives were recovered at the crime scene. Fowler's daughter identified the blade as having belonged to a knife missing from the kitchen. Fowler's blood was identified on this blade. Human blood was found on the blade of the buck knife, but the police were unable to determine whose blood was present. There was an indication that blood was present on the other knife, but it could not be identified.

Landress proceeded to trial on two counts: Count I charged murder in the perpetration of a robbery (felony murder), *Ind.Code* § 35–42–1–1(2), and Count II sought the death penalty for Landress' participation in an intentional killing during a robbery pursuant to *Ind.Code* § 35–50–2–9(b)(1)(G).

## Sufficiency of the Evidence on Intent to Kill

■ Landress claims that there was not sufficient evidence of her intent to kill necessary to impose the death penalty. We agree.

■ Where sufficiency of the evidence is challenged on review, this Court neither reweighs the evidence nor determines the credibility of witnesses. *Green v. State* (1992), Ind., 587 N.E.2d 1314, 1315. Instead, we look to the evidence most favorable to the verdict together with all reasonable inferences therefrom. *Id.* We then determine whether there is substantial evidence of probative value from which the trier of fact might reasonably have found the defendant guilty beyond a reasonable doubt.

Landress was originally charged with a knowing or intentional murder, *Ind.Code* § 35–42–1–1(1). The information was amended in December, 1988, by the addition of a count which sought the death penalty pursuant to *Ind.Code* § 35–50–2–9 for an intentional killing during a robbery. In February 1989, a count for felony murder, *Ind.Code* § 35–42–1–1(2) was added. On May 15, 1989, the day trial began, the State moved to dismiss the count charging a knowing or intentional murder. That dismissal left only the charge of felony murder in the guilt phase of the trial. Thus, during the guilt phase, the State was not required to prove that Landress had any intent to kill the victim, but only that Landress intended to rob and that the victim was killed during the robbery. *Ind. Code* § 35–42–1–1(2) and *Ind.Code* § 35–42–5–1. The jury properly was instructed during the guilt phase that Landress was criminally responsible for the actions of Lewellen "which were a probable and natural consequence of their common plan even though not intended as part of the original plan." She was convicted and the jury was reconvened to consider a recommendation of death.

■ The burden of proof on the issue of intent changed dramatically during the penalty phase of the trial. In that portion of the trial, the State was required to prove Landress had the intent to kill, *Ind.Code* § 35–50–2–9(b)(1)(G); her confederate's intent could not be imputed to her. *Enmund v. Florida* (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140.

The defendant in *Enmund* was the driver of a "getaway car" whose confederates robbed and killed an elderly farm couple. During the robbery, the defendant remained in the car, and was not present when the victims were actually confronted and killed. The defendant was sentenced to death under Florida statutes. The United States Supreme Court concluded that the death penalty could not be imposed on one who never intended to kill. Noting that because there was no evidence that the defendant intended to participate in or facilitate a murder, the Supreme Court held that to punish the defendant and his confederates alike by making the defendant vulnerable to the death penalty on account of his confederates' actions, would violate the Eighth Amendment. 458 U.S. at 799, 102 S.Ct. at 3377, 73 L.Ed.2d at 1158.

This Court discussed *Enmund* in *Resnover v. State* (1984), Ind., 460 N.E.2d 922, *cert. den.* 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160. There, we stated that *Enmund* "dictates the rule that although vicarious liability for crimes perpetrated by one's confederates can justify one's conviction for said crimes, the imposition of death upon a vicariously guilty defendant must be based on *his* culpability, not on that of those who committed the robbery and shot the victims for [the United States Supreme Court] insist[s] on individualized consideration as a constitutional requirement in imposing the death sentence." 460 N.E.2d at 935 (citations omitted).

■ Here, during the guilt phase of the trial, the jury was instructed that the actions and intent of Lewellen could be imputed to her for purposes of conviction for felony murder. This is, of course, proper. Such is not the case, however, during the penalty phase. As *Resnover* and its progeny tell us, during the penalty phase when a defendant is facing the death penalty, the factfinder's focus must be on that particular defendant's participation and culpability. Landress claims that the evidence presented at trial was insufficient to support the conclusion that she formed the requisite intent to kill. We agree.

■ Intent to kill need not be established by direct evidence; circumstantial evidence is sufficient. *Corbin v. State* (1990), Ind., 563 N.E.2d 86, 88. Landress' statement the night before the killing that she and Lewellen were going "rolling" evidenced her intent to rob, not to kill. Direct evidence of her intent came from her own testimony in which she denied having had any such intent to kill, and denied having stabbed Fowler. She testified that Lewellen and the victim were fighting face to face. The physical evidence is consistent with this testimony, because the fatal stab wound was inflicted from the front. There was no direct evidence that Landress intended to kill and, therefore, we must rely on inferences to find the requisite intent.

■ The evidence showed that the victim's blood was found on the knife blade which Landress had retrieved from the kitchen. From this fact, the State contends that an inference of intent to kill may be inferred. The State correctly notes that the law allows such an inference to be drawn from the intentional use of a deadly weapon in a manner reasonably calculated to produce death or great bodily injury. *Corbin*, 563 N.E.2d at 88. "Where there is substantial evidence in the record from which the trier of fact could find that the mortal wound was inflicted upon the victim by a deadly weapon in the hands of the defendant, intent can be inferred." *Brown v. State* (1981), Ind., 421 N.E.2d 629, 633. Here, however, there is no direct evidence that Landress either inflicted a mortal wound or even used the knife in a manner likely to cause great bodily injury or death.

We agree with the State that the jury could reasonably have inferred from the evidence that Landress' knife cut the victim. Having taken that inferential step, the State argues that such inferred fact can, in turn, support a second inference of Landress' intent to kill. Thus, from the State's own argument, it is clear that in order for the jury to have found that Landress acted with intent to kill, the jury must first have inferred that she used the knife on the victim, and then inferred that

she used it in a manner likely to cause death.

"The basis of inferences to support a presumption of fact is probability." *Serrano v. State* (1977), 266 Ind. 126, 131, 360 N.E.2d 1257, 1260. Thus, the jury must have determined the probability that Landress used the knife, then determined the probability that she used the knife in a manner likely to cause death, then determined the probability that she intended to kill. The probability of the second proposition being true is directly related to the probability of the first proposition being true, and so on. Thus, the probability of a given inference being accurate decreases with each inferential building block. The rule has been announced that "an essential element of an offense necessary in the proof of the offense and to sustain a verdict of guilty may not be proved by an inference which is founded solely and wholly upon another inference." *Smith v. State* (1928), 200 Ind. 411, 414, 164 N.E. 268, 269 (citations omitted).

 In a death penalty case, where the defendant has been assessed the ultimate penalty, we carefully examine the evidence to determine whether the penalty is appropriate to the offender and to the crime. *Ind.Code* § 35–50–2–9(h); Ind. Appellate Rule 17. Having reviewed the record in this case, we conclude that the death penalty is too final to permit it to be applied where, as here, intent to kill necessarily has been inferred solely and wholly upon another inference. We therefore hold that the State failed to meet its burden of proving, beyond a reasonable doubt, that Landress intended to kill the victim. A term of years is the appropriate punishment.

### Conclusion

In view of our resolution of this issue, we need not address the remaining issues raised by Landress. Accordingly, the death penalty sentence is vacated and this matter is remanded for imposition of a new sentence.

SHEPARD, C.J., and DeBRULER and DICKSON, JJ., concur.

GIVAN, J., dissents, with separate opinion.

GIVAN, Judge, dissenting.

I respectfully dissent from the majority opinion which sets aside the death penalty. By the appellant's own statements, she and William Lewellen intended to rob the victim. She aided Lewellen in this endeavor by, among other things, helping tie up the victim. However, after the victim had been tied up and while the robbery was still in progress, the victim escaped from his bonds and went into his bedroom where he obtained a shotgun and was attempting to load it.

Appellant alerted Lewellen to that fact and he immediately went to the bedroom and attacked the victim before he could get the shotgun loaded. Appellant went to the kitchen and obtained a butcher knife. The victim died of multiple stab wounds. The butcher knife was found at the scene with human blood on it but the technicians were unable to type the blood. Appellant had a cut on her hand at the time of her arrest.

In her testimony at trial, appellant claimed that she went to the kitchen and obtained the butcher knife in order to separate the men from fighting. However, in view of the facts, the jury was entitled to disbelieve this testimony. There is no question from appellant's own testimony as to whose side she was on when the fight erupted. To speculate that she obtained the butcher knife to force Lewellen to cease his attack on the victim strains credulity.

There is ample evidence in this case from which the jury could determine beyond a reasonable doubt that appellant and Lewellen were engaged in a joint enterprise of robbery, and when the victim was able to place himself in a threatening position, the robbers joined in an attack upon him resulting in his death. The inference of appellant's intent to kill may be based upon the inference of the guilt beyond a reasonable doubt on the above recited evidence. *See Buckner v. State* (1969), 252 Ind. 379, 248

N.E.2d 348; *Shutt v. State* (1953), 233 Ind. 169, 117 N.E.2d 892.

The majority opinion cites *Enmund v. Florida* (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 for the proposition that one who is merely a party to a robbery which results in death but who did not participate in the killing can be convicted but should not suffer the death penalty. There is no question that this is the law today. However, such is not the factual situation we have in the instant case.

In the case at bar, the jury was entitled to deduce from the evidence that appellant not only engaged in the robbery but joined with Lewellen in the attack upon the victim which resulted in his death. They were entitled to believe that she joined the attack with the butcher knife she had obtained from the kitchen. Thus the jury was entitled to find her intent to kill from the use of a deadly weapon in a manner likely to cause death. *Concepcion v. State* (1991), Ind., 567 N.E.2d 784.

I believe there is ample evidence in the case at bar to support the verdict of the jury. I would affirm the trial court in all respects.