Kofi Modibo AJABU, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 71S00–9512–CR–1377.

Supreme Court of Indiana.

March 6, 1998.

Jeffrey A. Lockwood, Anderson, for Appellant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

Kofi Modibo Ajabu was convicted of three counts of murder, three counts of criminal confinement, three counts of robbery, and one count of burglary. The trial court sentenced Ajabu to concurrent terms of life in prison without parole for each murder conviction, and to a term of years for each of the other convictions, sixty years of which to be served consecutively to the concurrent life terms. Ajabu's direct appeal presents several issues that we restate as follows:

I. Was Ajabu's state constitutional right to be free from self-incrimination, IND. CONST. art. I, § 14, violated by introduction of a confession obtained after law enforcement authorities failed to honor a lawyer's telephoned request, of which Ajabu was unaware, that Ajabu not be questioned until the lawyer was present?

II. Did this conduct of the authorities violate Ajabu's right to due process of law under the Fourteenth Amendment to the United States Constitution?

III. Do the trial court's findings that Ajabu acted knowingly and was a major participant in the killings satisfy the death penalty statute's requirement of a showing that Ajabu "committed the murder by intentionally killing" the victims in this case, IND. CODE § 35-50-2-9(b)(1)?

We affirm the convictions. Because we hold that error occurred in the sentencing, we remand for reconsideration of the sentence consistent with this opinion.

### Factual and Procedural History

At approximately 7 a.m. on March 17, 1994, Nicholas Allemenos, Lisa Allemenos, and Christopher James were found dead in

the home of Nicholas's and Lisa's father, George Allemenos, in Carmel. The house had been ransacked and the three victims' throats had been cut. Immediately after their discovery, the crimes attracted extensive coverage in both print and electronic news media. Defendant Kofi Ajabu and two other men, James Walls and Raymond Adams, soon became suspects.[1] The next night, at approximately 4:40 a.m., Ajabu was arrested at Adams's apartment and detained in a police vehicle. Around 6 a.m., Ajabu was transported to the Hamilton County Jail and placed in a holding cell, where he slept for a short time. Ajabu's father saw a televised news report that morning reporting that his son "had been arrested in the Carmel situation." Without his son's knowledge, the father retained attorney Kenneth Roberts to represent Ajabu. At approximately 8:42 a.m., Roberts called the jail and asked that Ajabu not be questioned until Roberts was present. The detective who took the call, Vicky Dunbar, put Roberts on hold. Dunbar then asked several police officers and two prosecutors who were discussing the murder investigation in a nearby conference room how to respond. On learning of Roberts's request, one officer got up to halt plans to interrogate Ajabu, but Chief Deputy Prosecutor Wayne Sturtevant essentially overruled that decision. According to Hamilton County Prosecutor Steven Nation, who was also present, Sturtevant said: "Wait a minute ... there is a case on point, you do not have to stop the interrogation." Sturtevant concluded that Ajabu (then twenty-one years old) was an adult and could make his own decision whether he wanted a lawyer present during the planned questioning. Nation believed that Ajabu's right to counsel was per-

sonal and could not be asserted by his family. Based on these conclusions, Detective Dunbar was directed to tell Roberts that the "information would be passed along to the appropriate people."

Ajabu was not informed of Roberts's call at that point and two officers began questioning him five minutes later at 8:49 a.m. Before the interrogation, Ajabu received the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and signed a waiver of rights form. The videotaped questioning lasted until 10:40 a.m., recessed for a brief period, and then continued. Ajabu confessed his involvement in the multiple homicide. At no point during the questioning did he request the assistance of a lawyer. Around 12:30 p.m., police asked Ajabu if he would submit to a second interview at the house where the murders occurred and he agreed. Police took Ajabu to the murder scene and interviewed him there on videotape for approximately forty-five minutes. Before this questioning, an officer asked Ajabu if he understood his rights and he indicated that he did. Ajabu again confessed his involvement in the killings. As Ajabu was being transported back to the Hamilton County Jail around 2:22 p.m., he asked for an attorney and was not questioned further. At some point that afternoon, after demanding counsel, Ajabu was told about Roberts's call earlier that day.[2]

Ajabu was charged with three counts of murder, three counts of criminal confinement, three counts of robbery, and one count of burglary. Venue was changed to St. Joseph County and Ajabu was tried there in

---

1. Walls and Adams were also charged as a result of these events and were tried separately.

2. The facts outlined here are largely taken from the findings the trial court made in denying Ajabu's motion to suppress. In his motion to suppress, Ajabu asserted that he asked to call a lawyer during his initial trip to the Hamilton County Jail, but the transporting officer denied this request was made. Ajabu further contended that soon after arriving at the jail that morning he asked one of two correctional officers present if he could call his mother so that she could retain counsel, but neither officer recalled any

effort by Ajabu to get their attention. The denial of a motion to suppress a confession is reviewed similarly to other sufficiency matters. The record must disclose substantial evidence of probative value that supports the trial court's decision. We do not reweigh the evidence and we consider conflicting evidence most favorably to the trial court's ruling. *See, e.g., Wilcoxen v. State,* 619 N.E.2d 574, 577 (Ind.1993); *Warner v. State,* 579 N.E.2d 1307, 1309 (Ind.1991). Accordingly, we accept the trial court's resolution of these factual issues.

August 1995. A jury convicted him on all counts and he appeals. We have jurisdiction under Indiana Appellate Rule 4(A)(7).

## I. Indiana Constitutional Right to be Free From Self–Incrimination

Ajabu moved unsuccessfully before trial to suppress the statements he gave at the Hamilton County Jail and at the Allemenos residence. He contends the trial court erred in denying the motion and in subsequently admitting the statements into evidence over objection. Ajabu's principal contention is that the conduct of the police and prosecutors in not informing him of Roberts's phone call before any interrogation violated his right to be free from self-incrimination protected by Article I, Section 14 of the Indiana Constitution. He also argues that this conduct was so shocking that it denied him due process of law under the Fourteenth Amendment. The latter claim is discussed in Part II.

### A. *The nature and constitutional footings of Ajabu's claim*

■ The Supreme Court of the United States has rejected nearly identical contentions under the Constitution of the United States. In *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Court squarely held that neither the Fifth Amendment nor the Fourteenth Amendment guarantee of due process is violated by admission of a confession obtained after an attorney, unknown to the suspect, unsuccessfully seeks to intervene in an interrogation. Recognizing the insuperable hurdle *Burbine* presents as a matter of federal constitutional doctrine, Ajabu urges us to hold that the Indiana Constitution is violated where (1)

police fail to inform a suspect prior to interrogation of a lawyer's unsolicited and unknown efforts to contact the suspect; or (2) police do not honor counsel's request to be present during any questioning. He argues that his waiver of his right to be free from self-incrimination was not knowing, voluntary, and intelligent under these circumstances. Stated another way, Ajabu's claim is that a confession that is "voluntary" in a volitional sense must nonetheless be excluded, because he was unaware of the lawyer's efforts to reach him, and this knowledge would have affected his decision to speak with authorities. Ajabu correctly observes that *Burbine* does not prevent Indiana from providing greater procedural guarantees for defendants on independent state grounds. *Id.* at 428, 106 S.Ct. at 1144–45. The State responds that the Indiana constitutional right is equivalent to the Fifth Amendment, and therefore reflects *Burbine,* or at least the Indiana right is not more protective than the Fifth Amendment.

■ In assessing this claim, we first must be clear about the nature of the right at issue. The federal right to counsel as protected by the Sixth Amendment, so as to ensure a fair trial after charges are filed, *cf. United States v. Gouveia,* 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984), is not implicated here because Ajabu had not been charged or arraigned at the time of the alleged constitutional deprivation.[3] Nor does Ajabu cite the state constitutional provision guaranteeing that "[i]n all criminal prosecutions, the accused shall have the right to ... be heard by himself and counsel...." IND. CONST. art. I, § 13. Rather, in moving to suppress his statements at trial, Ajabu relied solely on his right to be free from self-

---

**3.** *Under similar facts in* Burbine, *the Supreme Court rejected the claim that the Sixth Amendment had been violated. The Court reiterated that the Sixth Amendment right to a lawyer does not attach until formal charges are filed. This well established rule could not be unilaterally altered by "the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation."* Burbine, *475 U.S. at 430, 106 S.Ct. at 1145. Permitting a suspect to control the circumstances under which the Sixth Amend-*

*ment would apply would contravene its underlying purpose: "The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any criminal prosecution the accused shall not be left to his own devices...."* Id. *(internal quotation marks and citation omitted).*

incrimination under the Constitutions of Indiana (Article I, Section 14) and the United States (Fifth Amendment). Accordingly, we do not address the possible application of the Section 13 right to counsel to these facts.[4] Because it is rooted in the right to be free from self-incrimination, Ajabu's claim is grounded on his right to elect to have a lawyer present during pre-charge interrogation · for prophylactic reasons established in *Miranda.* The issue presented, therefore, is whether that right was violated ·where Ajabu did not request an attorney during or before interrogation and did not know of the activities of the lawyer his father had contacted.[5]

**4.** Ajabu's election to rely on Section 14 is consistent with Indiana precedent. Depending on the circumstances, the Section 13 right to counsel, unlike the Sixth Amendment, has been said to be available prior to the filing of formal charges against the accused. In those cases, however, the suspect explicitly· requested to consult an attorney. *See, e.g., Suter v. State,* 227 Ind. 648, 88 N.E.2d 386 (1949); *Batchelor v. State,* 189 Ind. 69, 125 N.E. 773 (1920). *Suter* and *Batchelor* held that the Section 13 right to counsel was violated where police failed to honor a suspect's request, made while in police custody, to meet with a lawyer before arraignment on an indictment (*Batchelor*) and the filing of an information (*Suter*). *Taylor v. State,* 689 N.E.2d 699 (Ind. 1997), decided after the events in today's case, made clear that an express request is required to trigger the Indiana constitutional right to counsel and preclude further questioning in custody. *Id.* at 703–04. Here there was no request—and *a fortiori* no refused request—to trigger rights under either *Suter* or *Batchelor.* Other decisions under the Indiana Constitution emphasized the lack of a request in turning back the defendant's claim that the right to counsel had been violated. For example, in a case in which it appears no request was made, we rejected the assertion that the interrogating officers could not question the suspect without providing him with a lawyer or advising him of his "constitutional rights to counsel." *Marshall v. State,* 227 Ind. 1, 9–11, 83 N.E.2d·763, 766–67 (1949). In *Flowers v. State,* 236 Ind. 151, 139 N.E.2d 185 (1956), defendant Flowers was being held and questioned by police regarding his possible involvement in a murder. Flowers's relatives attempted to see him during the interrogation, were denied access, and Flowers confessed to the crime. The next day Flowers's brother employed a lawyer on his behalf. Citing *Marshall,* we held that Flowers had not been deprived of his "right to counsel" because he did not demand a lawyer before being questioned, spoke freely with police, and was not denied access to his lawyer at any time. *Id.* at 158–59, 139 N.E.2d at 190–91.

## B. *Sources of construction for Indiana constitutional claims*

■ Article I, Section 14 of the Indiana Constitution provides that "[n]o person, in any criminal prosecution, shall be compelled to testify against himself."[6] Neither party cites any directly controlling precedents, and Ajabu conceded in his motion to suppress that there appear to be none.[7] In the absence of relevant Indiana cases, a variety of sources may be taken into consideration. There are analogous precedents under the federal constitution and those of a few other states. We also have an extensive history of decisions of this Court on various self-incrim-

**5.** As noted above, we accept the trial court's resolution of whether Ajabu asked for the assistance of counsel before he was questioned. *See* note 2 *supra.* Ajabu asserts that other provisions of the Indiana Bill of Rights also condemn the failure to inform him of the lawyer's efforts and hence render the waiver invalid. For example, he points to the requirement that criminal suspects not be treated with "unnecessary rigor," IND.CONST. art. I, § 15, and contends that police denied him his constitutional right to "free interchange of thought." IND CONST. art. I, § 9. Because Ajabu did not advance these arguments in the trial court, we do not consider them here.

**6.** *Cf.* U.S. CONST. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself. . . ."). Article I, Section 14 of the Indiana Constitution also protects the right not to be put in jeopardy twice for the same offense. In the context of this case, references to Section 14 and to the Fifth Amendment to the Constitution of the United States deal only with the right to be free from self-incrimination.

**7.** The State argues that we "adopted" and "followed" the *Burbine* approach in *McClaskey v. State,* 540 N.E.2d 41 (Ind.1989). In that case, a lawyer hired by the defendant's grandmother went to the police station to attempt to speak with the defendant. When police told the defendant about the lawyer's inquiry, she declined his services. The trial court admitted all statements made before the lawyer arrived but suppressed the rest. The only issues on appeal related to the pre-arrival interrogation. Although in *McClaskey* this Court discussed *Burbine* in upholding the denial of the defendant's motion to suppress, it is not clear from *McClaskey* whether that case turned on the Fifth Amendment, the Fourteenth Amendment, or some other provision. Because there is no mention of the Indiana Constitution, and no suggestion that any state constitutional issue was raised, *McClaskey* does not support the notion that *Burbine* has been incorporated into Indiana constitutional jurisprudence.

ination issues under the Indiana and United States Constitutions. In construing the Indiana Constitution, we recently noted that it is appropriate to look to "the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions." *Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind.1996) (internal quotation marks omitted).

This case involves a federal constitutional analog that applies in state proceedings by virtue of Fourteenth Amendment incorporation. In that circumstance, we have found Indiana case law construing the Indiana provision prior to the date of incorporation to be "most helpful" in determining whether the Indiana Constitution demands more than its federal counterpart. *Moran v. State*,[8] 644 N.E.2d 536, 540 (Ind.1994); *see also Peterson v. State*, 674 N.E.2d 528, 533–34 (Ind.1996) (reviewing pre-incorporation case law in assessing whether standing is required to challenge constitutionality of search or seizure under Section 11 of the Indiana Bill of Rights), *cert. denied*, —— U.S. ——, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998). More generally, "[e]arly decisions of this Court interpreting our Constitution ... have been accorded strong and superseding precedential value. Prior cases construing and applying [the Indiana provision] independently from federal [doctrine] are important sources for our consideration." *Collins v. Day*, 644 N.E.2d 72, 77 (Ind.1994) (internal quotation marks and citations omitted). As elaborated below, both the federal and Indiana self-incrimination provisions look to a common interwoven history. Common roots and a history of coextensive construction may support the conclusion that the Indiana and federal constitutions protect the same bundle of rights and the same constitu-

tional values. However, past reliance on federal case law in construing an Indiana constitutional provision does not preclude formulation of an independent standard for analyzing state constitutional claims. *Id.* at 75. Even where an Indiana constitutional provision is substantially textually coextensive with that from another jurisdiction, as in this case, we may part company with the interpretation of the Supreme Court of the United States or any other court based on the text, history, and decisional law elaborating the Indiana constitutional right.[9]

C. *Construction of the Indiana right in light of its text and underlying purposes*

The "cardinal principle of constitutional construction [is] that words are to be considered as used in their ordinary sense." *Tucker v. State*, 218 Ind. 614, 670, 35 N.E.2d 270, 291 (1941). On this first line of inquiry in any constitutional case—constitutional text—the document is unambiguous for these purposes: "No person, in any criminal prosecution, shall be *compelled* to testify against himself." IND. CONST. art. I, § 14 (emphasis added). The construction Ajabu urges us to adopt would require judicial redefinition of the word "compelled" to mean something it did not mean when the Indiana Constitution was adopted, and does not mean today. *Compare* WEBSTER'S NEW WORLD DICTIONARY 284 (3d ed.1988) (defining "compel" to mean "to force or constrain ... to get or bring about by force") *with* NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 235 (3d ed. 1856) (defining "compelled" to mean "forced; constrained; obliged"). The 1850–51 constitutional debates are bereft of any

---

8. This case is cited throughout the opinion as *Moran v. State* to avoid confusion with *Moran v. Burbine*, which is referred to simply as *Burbine*.

9. *See Brady v. State*, 575 N.E.2d 981 (Ind.1991) (holding that statute allowing videotaped testimony of child witnesses at trial violated state constitutional right of confrontation but not Sixth Amendment right); *Peterson v. State*, 674 N.E.2d 528, 534 & n. 3 (Ind.1996) (noting differences between Fourth Amendment and Indiana

case law on requirements for standing to challenge constitutionality of search or seizure), *cert. denied*, —— U.S. ——, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998); *Moran v. State*, 644 N.E.2d 536, 539–40 (Ind.1994) (rejecting two-prong test used in Fourth Amendment search and seizure jurisprudence, and establishing "reasonableness" test for adjudicating claims under Article I, Section 11 of the Indiana Constitution).

discussion of this provision and give us no reason to find an unusual usage of these common words.[10]

■ The decisional law as far back as 1860 has focused on the prerequisite of compulsion: "[The right] exempts no one from the consequences of a crime which he may have committed, but only from the necessity of himself producing the evidence to establish it." *Wilkins v. Malone*, 14 Ind. 153, 156 (1860). Stated concisely, our cases establish that there is a right not to be forced to speak, but there is no right to bar a confession freely given after appropriate warnings and waivers. *See also Corder v. State*, 467 N.E.2d 409, 415 (Ind.1984) (defendant who spoke freely to court-appointed psychiatrists was not denied his rights under Section 14 or the Fifth Amendment); *Ross v. State*, 204 Ind. 281, 293, 182 N.E. 865, 869 (1932) ("The essence of the privilege is freedom from testimonial compulsion."); *cf. State ex rel. Keller v. Criminal Court of Marion County*, 262 Ind. 420, 428, 317 N.E.2d 433, 438 (1974) ("The Fifth Amendment is not a bar to any conviction resting on self-incrimination. It prohibits only compelled self-incrimination.").

■ We recently reiterated that the purpose underlying an Indiana constitutional provision is critical to ascertaining "what the particular constitutional provision was designed to prevent." *Town of St. John*, 675

N.E.2d at 321 (internal quotation marks omitted). In this case, there is no connection between the purpose to be advanced by Article I, Section 14 and the evil Ajabu asks us to proscribe. The treatment of a lawyer whose services and efforts were unknown to Ajabu cannot have affected the voluntariness of his decision to speak with his interrogators about the crimes in this case. This is a critical point. As Justice Brennan declared in holding the federal self-incrimination right applicable to the states in 1964: "[T]he constitutional inquiry [under the Fifth Amendment] is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was free and voluntary." *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964) (internal quotation marks omitted). Or, as this Court remarked in rejecting a claim that the Indiana constitutional right had been abridged in a 1902 case: "Whether [the suspect] should so testify was, therefore, a personal privilege which he could claim or not as he chose. If he gave such criminating [sic] evidence voluntarily, his constitutional rights were not violated. It is a general rule that when a personal privilege exists for a witness to testify or not as he chooses, if he does testify without objection he will be deemed to have done so voluntarily." *State*

---

10. The debates offer little insight on the specific issue presented today. At most we find some general directional guidance from debates dealing with other subjects. Several delegates in another context condemned the disgraced legacy of the Star Chamber, where subjects of the English Crown were questioned in secret and forced in essence to convict themselves with their own words. *See generally* 1 REPORTS OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF INDIANA 135–215 (1850) (lengthy debate over whether to abolish grand jury system). The dearth of dialogue on this provision was typical of the constitutional protections governing criminal procedure. *See Moran v. State*, 644 N.E.2d 536, 539 (Ind.1994) (concluding that state constitutional right to be free from unreasonable searches and seizures was included in Indiana Bill of Rights without much debate); *Miller v. State*, 517 N.E.2d 64, 68–69 (Ind.1987) (discussing relatively unknown origins of state constitutional right to meet witnesses "face to face"). Indeed, "the Bill of Rights captured only modest attention." *Price v. State*, 622 N.E.2d 954, 962 (Ind.1993) (analyzing history surrounding Article I, Section 9); *see*

*also Indiana Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 299–300 (Ind.1994) (concluding that main catalysts for drafting new constitution were state's financial woes and desire to limit General Assembly's ability to enact special laws dealing with local matters).

The history of the formulation of the right is equally unenlightening. It was protected explicitly in Article I, Section 13 of the Indiana Constitution of 1816: "[I]n all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself...." As originally reported from the Committee on Revision, Arrangement, and Phraseology at the 1850–51 constitutional convention, the self-incrimination right was substantively unchanged from the 1816 constitutional provision: "No person shall be compelled to give evidence against himself in any criminal prosecution." JOURNAL OF THE CONVENTION OF THE PEOPLE OF THE STATE OF INDIANA TO AMEND THE CONSTITUTION 869 (1851). However, the phrase "give evidence" was dropped in favor of "testify" in the version that was eventually adopted as Article I, Section 14 of the Indiana Constitution of 1851. The reason for this change was not discussed in the debates.

*v. Comer*, 157 Ind. 611, 613, 62 N.E. 452, 453 (1902); *see also Ogle v. State*, 193 Ind. 187, 127 N.E. 547 (1920) (assertion of right to remain silent during police questioning is personal and may be waived). In sum, the language, textual history, and purpose of Article I, Section 14 of the Indiana Constitution all point to the conclusion that it protects the defendant against use of his compelled testimony, not his voluntary statements. The propriety of the treatment of a third person is extraneous to that analysis.

### D. *Indiana and federal precedents demonstrate a common objective of the two constitutional rights*

That we reach the same conclusions drawn by the Supreme Court of the United States on this issue in *Burbine* is consistent with the interwoven history of the federal and state rights. The Indiana right has been thought to be derived in part from earlier state constitutions. WILLIAM P. McLAUGHLIN, THE INDIANA STATE CONSTITUTION 46 (1996). Similarly, the language of the Fifth Amendment enjoys some precedent in state constitutional provisions that were enacted before the Federal Bill of Rights. Eben Moglen, *Taking the Fifth: Reconsidering the Origins of the Constitutional Privilege Against Self–Incrimination*, 92 MICH.L.REV. 1086, 1118–23 (1994) (concluding that historical evidence is thin and inconclusive on precise impact of state provisions on framing of Fifth Amendment).

Although not dispositive, the parallel development of the federal and Indiana doctrines is also relevant to this inquiry. The Fifth Amendment right to be free from self-incrimination was not held applicable to state criminal trials via the Fourteenth Amendment until 1964. *Malloy*, 378 U.S. at 6, 84 S.Ct. at 1492–93. Since that time, self-incrimination issues have more often been presented to our state courts under the Fifth Amendment. To the extent the state constitutional right has been implicated since *Malloy*, separate analysis of the right has been sparse. Indeed, we declared without elaboration in a 1970 case that the Indiana right "has the same scope and effect as the privilege against self-incrimination in the Fifth Amendment." *Haskett v. State*, 255 Ind. 206, 209, 263 N.E.2d 529, 531 (1970) (footnote omitted). Other post-*Malloy* decisions appear to have assumed as much without saying so explicitly. *See, e.g., Bivins v. State*, 433 N.E.2d 387, 390 (Ind.1982); *Brown v. State*, 256 Ind. 558, 270 N.E.2d 751 (1971). However, for a century and a half before *Malloy*, the two doctrines existed in parallel but did not apply to the same proceedings. As a result, there is an abundance of decisional law from the pre-*Malloy* period construing the Indiana right to be free from self-incrimination. Not surprisingly, Indiana self-incrimination doctrine emerged as virtually identical to the federal constitutional right. Many Indiana decisions, based on independent state grounds, in fact preceded and presaged similar rulings from the Supreme Court of the United States.[11]

11. For example, Indiana long ago held its right to be testimonial in nature. It therefore is not abridged where police examine a criminal suspect in custody for identifying marks or scars, *O'Brien v. State*, 125 Ind. 38, 25 N.E. 137 (1890); where police forcibly seize a suspect's shoes as evidence, *Biggs v. State*, 201 Ind. 200, 204, 167 N.E. 129, 131 (1929) ("In the instant case, it was the shoes and not the accused that testified."); where a suspect is produced for identification purposes and the witness testifies about the identification at trial, *Ross v. State*, 204 Ind. 281, 182 N.E. 865 (1932); and where the accused is forced at trial to don a coat worn by the perpetrator. *Bivins v. State*, 433 N.E.2d 387, 390 (Ind.1982). Fifth Amendment doctrine is similar. *Cf., e.g., United States v. Dionisio*, 410 U.S. 1, 5–7, 93 S.Ct. 764, 767–68, 35 L.Ed.2d 67 (1973) (discussing decisions holding that Fifth Amendment did not require exclusion of the suspect's physical person as evidence where it may be material). The state constitutional right may be asserted in a civil proceeding where the evidence sought to be adduced could be a basis for criminal liability. *Wilkins v. Malone*, 14 Ind. 153, 154 (1860). The same is generally true under the Fifth Amendment. *Cf. Kastigar v. United States*, 406 U.S. 441, 444 & n. 10, 92 S.Ct. 1653, 1656 & n. 10, 32 L.Ed.2d 212 (1972) (collecting cases). Indiana and federal courts have both adopted a "chain of evidence" approach. Accordingly, the disputed testimony need not be directly incriminating; a witness may assert the right to remain silent "[i]f the fact to which he is interrogated forms but one link in the chain of testimony which would convict him." *French v. Venneman*, 14 Ind. 282, 283 (1860); *cf. Blau v. United States*, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950) (reiterating chain of evidence test under Fifth Amendment).

In other instances, judicial development of the Indiana and Fifth Amendment rights to be free from self-incrimination occurred similarly but independently, in some circumstances reaching identical conclusions without reference to relevant authority from the other jurisdiction. *Compare Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892) (holding that right was available in grand jury proceedings) *with Comer,* 157 Ind. at 613, 62 N.E. at 453 (finding the same under Indiana Constitution ten years after *Counselman,* but without referring to federal jurisprudence). And there are cases in which the Indiana rule was formulated in express reliance on a federal antecedent. *See, e.g., Wilson v. Ohio Farmers' Ins. Co.,* 164 Ind. 462, 73 N.E. 892 (1905) (relying in part on Chief Justice John Marshall's reasoning in the trial of Aaron Burr). The similarity of the text of Section 14 of the Indiana Bill of Rights to its federal counterpart and their parallel judicial history support but do not compel the conclusion that the framers of the Indiana Constitution and the authors of the Fifth Amendment had the same objectives. As Chief Justice Shepard recently put it: "Much of the national or federal consensus on the broad outlines of various fundamental rights is the product of cross-breeding between state and federal constitutional discourse. It is hardly surprising then ... that a national synthesis has emerged about the central features of certain core values." Randall T. Shepard, *The Ma-*

*turing Nature of State Constitution Jurisprudence,* 30 VAL.U.L.REV. 421, 440–41 (1996) (footnote omitted). Even if no national consensus has emerged on this point,[12] interpretation of a provision of our state constitution consistent with precedent under its federal counterpart is appropriate where the tools for constitutional interpretation point in that direction. Robert F. Williams, *In the Glare of the Supreme Court: Continuing Methodology and Legitimacy Problems in Independent State Constitutional Rights Adjudication,* 72 NOTRE DAME L.REV. 1015, 1017 (1997). This is true of the core value of the right not to incriminate oneself.

### E. Doctrinal and practical considerations

There are good reasons not to stray from the historical focus on testimonial compulsion. This case presents no claim of compulsion, but rather turns on whether alleged misconduct outside the interrogation room can nullify an otherwise valid confession. Ajabu's proposed construction of Section 14 would transfer to the bar and others the right to terminate an interrogation that was proceeding voluntarily. *Miranda* warnings are intended to give the suspect some control over the circumstances surrounding the interrogation. They do not give a lawyer control over the interrogation unless the suspect requests it. Moreover, the warnings are not designed to suggest to suspects otherwise

Indiana and federal law regulating immunized witnesses are also parallel. *Compare In re Caito,* 459 N.E.2d 1179 (Ind.1984); *Overman v. State,* 194 Ind. 483, 488, 143 N.E. 604, 606 (1924) (grant of immunity must protect the witness "to the same extent" as the constitutional right); *Wilkins,* 14 Ind. at 156–57; *and Frazee v. State,* 58 Ind. 8, 12–13 (1877) (following *Wilkins*) *with Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1661 (holding that "use" and "derivative use" immunity were coextensive with Fifth Amendment right against self-incrimination and therefore sufficed to compel testimony over assertion of the right). The state right applies in pretrial settings, including grand jury questioning, *State v. Comer,* 157 Ind. 611, 62 N.E. 452 (1902), and police interrogation, *Ogle v. State,* 193 Ind. 187, 127 N.E. 547 (1920). *See also French,* 14 Ind. at 282–83 (party in a civil case did not have to answer interrogatories that could have exposed him to criminal prosecution); *Lander v. State,* 238 Ind. 680, 154 N.E.2d 507 (1958) (accused in criminal case

could not be compelled to answer interrogatories). Similarly, the Fifth Amendment is available during grand jury questioning, *Counselman v. Hitchcock,* 142 U.S. 547, 563–64, 12 S.Ct. 195, 198–99, 35 L.Ed. 1110 (1892), and custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 460–61, 86 S.Ct. 1602, 1620–21, 16 L.Ed.2d 694 (1966). Finally, the Indiana constitutional right, like its federal counterpart, is violated where the State impermissibly comments on the defendant's failure to testify. *Compare Keifer v. State,* 204 Ind. 454, 184 N.E. 557 (1933) *with Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

**12.** Although some jurisdictions attribute other objectives to the right, such as deterrence of questionable interrogation methods, *see* Part I.F *infra,* all appear to agree that a central feature of the right is freedom from compulsion. Certainly the construction we give to the Indiana right reflects this common objective.

speaking without compulsion that they should have a lawyer present when they have explicitly declined one, or that they should not talk at all.

▆▆▆▆ Because the federal and state rights serve the same goals, the reasoning with respect to the right to be free from self-incrimination expressed in *Burbine* is also applicable to Article I, Section 14 of the Indiana Constitution. In *Burbine,* the Supreme Court rejected a similar invitation to expand the self-incrimination right under the federal constitution. Writing for a six-to-three majority, Justice O'Connor dismissed the notion that a lawyer's efforts to contact a suspect could render a *Miranda* waiver invalid: "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Burbine,* 475 U.S. at 422, 106 S.Ct. at 1141. In essence, the Court held that the protections *Miranda* and subsequent cases provide were adequate to ensure that the waiver was voluntary as a matter of law. *Id.* at 422–23, 106 S.Ct. at 1141–42. And as a matter of Fifth Amendment doctrine, *Burbine* emphasized the "elemental and established proposition that the privilege against compulsory self-incrimination is, by hypothesis, a personal one that can only be invoked by the individual whose testimony is being compelled." *Id.* at 434 n. 4, 106 S.Ct. at 1147 n. 4. The Court was equally unequivocal that the conduct of the police towards counsel had no bearing on the waiver analysis: "[W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident." *Id.* at 423, 106 S.Ct. at 1142 (citation omitted).

▆▆▆▆ In concluding in *Burbine* that the Fifth Amendment had not been offended, Justice O'Connor made several points consistent with the result we reach today: (1) because *Miranda* warnings are prophylactic and not themselves constitutionally required, the warnings did not provide a license for molding police conduct so long as they served their purpose of protecting the self-incrimination right; (2) how police treated an attorney whose representation was unknown to the suspect is unrelated to *Miranda*'s purpose of dissipating the coercion inherent in police interrogation; (3) *Miranda* is a bright-line rule whose ease of application would be jeopardized if the validity of the waiver hinged on events occurring outside the stationhouse; (4) expanding *Miranda* would upset the careful balance that decision struck between the objective of preventing coerced confessions and the need to enable police to gather truthful information through non-coercive questioning; and (5) the benefit to the suspect of knowing of the attorney's unsolicited efforts would be marginal and the costs to society great, because counsel's inquiry would actively encourage the suspect not to speak at all. *Id.* at 424–27, 106 S.Ct. at 1142–44.

Justice Byron White's observations in his concurring opinion in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) are also relevant:

> There is little support in the law or in common sense for the proposition that an *informed* waiver of a right may be ineffective even where voluntarily made.... Unless an individual is incompetent, we have in the past rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case. To do so would be to imprison a man in his privileges....

*Id.* at 108–09, 96 S.Ct. at 328–29 (White, J., concurring in the result) (citations, internal quotation marks, and footnote omitted) (emphasis in original). We share the Supreme Court's confidence that a "suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted." *Davis v. United States,* 512 U.S. 452, 460–61, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994). This is not a case in which police stood between counsel and a suspect who sought the lawyer's assistance. *Cf. Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (when

suspect invokes Fifth Amendment right to the presence of an attorney during custodial interrogation, all questioning must cease until counsel is made available or the suspect voluntarily initiates communication with the police); *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (applying *Edwards* rule to Sixth Amendment violations); *Suter v. State,* 227 Ind. 648, 88 N.E.2d 386 (1949) (police refusal during interrogation to honor suspect's request for counsel rendered confession inadmissible under Article I, Section 13 of the Indiana Constitution). Nor did police mislead Ajabu about the contents of Roberts's phone call. *Cf. Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

 Requiring police to honor a lawyer's unsolicited request to be present during interrogation would in effect create an "undifferentiated right to the presence of an attorney that is triggered automatically by the initiation of the interrogation itself." *Burbine,* 475 U.S. at 434 n. 4, 106 S.Ct. at 1147 n. 4. *Miranda* expressly rejected the idea that "each police station must have a 'station house lawyer' present at all times to advise prisoners." *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628. In sum, the necessity of a clear request for counsel in the Fifth Amendment context has remained paramount in application of *Miranda, see, e.g., Davis,* 512 U.S. at 461, 114 S.Ct. at 2356 (holding that unless suspect "clearly requests" counsel, police do not have to halt questioning); *Mosley,* 423 U.S. at 104 n. 10, 96 S.Ct. at 326 n. 10 (reiterating *Miranda*'s holding that counsel must be present during questioning only if the suspect requests an attorney), and we hold today that it is a prerequisite for invoca-

tion of the Indiana constitutional right under Section 14. *See also* footnote 4 *supra.*

## F. *Constitutional doctrine from other states*

Finally, Ajabu points to decisions of other state supreme courts construing similar provisions of their own constitutions in factually similar circumstances. We have looked to other state constitutional doctrine in interpreting the self-incrimination right under the Indiana Constitution. *See, e.g., Noelke v. State,* 214 Ind. 427, 15 N.E.2d 950 (1938); *Ule v. State,* 208 Ind. 255, 194 N.E. 140 (1935); *cf. Bayh v. Sonnenburg,* 573 N.E.2d 398, 414 n. 19 (Ind.1991) (noting that Tennessee Supreme Court had similarly construed Tennessee analog to Indiana constitutional provision proscribing demand of services without "just compensation"). A number of state appellate courts, both before and after *Burbine,* have addressed on independent state grounds whether a waiver of the right to be free from self-incrimination was knowing, intelligent, and voluntary under facts similar to those present here. As of this writing, at least Michigan, Oregon, and Oklahoma have held the confession to be inadmissible under their state constitutions.[13] In contrast, Colorado, Maryland, Tennessee, Washington, and Wisconsin have essentially followed *Burbine* in interpreting their constitutional self-incrimination provisions.[14] Some courts have found the waiver invalid on other state grounds, including due process and right to counsel under their constitutions.[15] However, the result in this case must be driven by what is most appropriate under the Indiana Constitution. We affirm the trial court's conclusion that Ajabu knowingly, intelligent, and voluntarily waived his

---

13. *See People v. Bender,* 452 Mich. 594, 551 N.W.2d 71 (1996); *State v. Haynes,* 288 Or. 59, 602 P.2d 272 (1979); *Lewis v. State,* 695 P.2d 528 (Okla.Crim.App.1984).

14. *See People v. Page,* 907 P.2d 624 (Colo.Ct.App. 1995); *Lodowski v. State,* 307 Md. 233, 513 A.2d 299 (1986); *State v. Stephenson,* 878 S.W.2d 530 (Tenn.1994); *State v. Earls,* 116 Wash.2d 364, 805 P.2d 211 (1991); *State v. Hanson,* 136 Wis.2d 195, 401 N.W.2d 771 (1987).

15. *See, e.g., State v. Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988) (due process). The case law

from other jurisdictions dealing with issues similar to those presented here is collected and discussed in a number of secondary sources. *See generally* Jennifer Friesen, State Constitutional Law § 12–2(c)(3), at 695–97 (2d ed. 1996 & Supp. 1997); 2 Joseph G. Cook, Constitutional Rights of the Accused § 6:20 (3d ed.1996); David M. Nissman & Ed Hagen, Law of Confessions § 6:9 & 11:7 (2d ed. 1994 & Supp.1997); Sonja A. Soehnel, Annotation, *Denial of, or Interference With, Accused's Right to Have Attorney Initially Contact Accused,* 18 A.L.R.4th 669 (1982 & Supp.1997).

state constitutional right to be free from self-incrimination, and conclude that Article I, Section 14 of the Indiana Constitution does not bar use of the resulting confession.

## II. Claims of Police Misconduct and Fourteenth Amendment Due Process

In this appeal, Ajabu contends for the first time that the actions of the police and prosecutors were so offensive that they denied him due process of law as protected by the Fourteenth Amendment. In this suggestion, Ajabu follows *Burbine*, which concluded that to the extent police deception can support a constitutional claim it is properly analyzed as a matter of due process. *Burbine*, 475 U.S. at 432–34, 106 S.Ct. at 1146–48. Ajabu explicitly declined to take this tack in his motion to suppress, where he asserted that his claim was more appropriately assessed under the Fifth Amendment and that *Burbine* in this respect was distinguishable. He contends in this appeal that he is entitled to relief on due process grounds.

 Assuming this argument is not waived for failure to present it below, we conclude that Ajabu was not denied his rights under the Fourteenth Amendment. In *Burbine*, a public defender retained by a member of Burbine's family to represent him called the police station where Burbine was being held and asserted that she would act as Burbine's legal counsel if police wanted to question him. In response, the public defender was told that the police "would not be questioning Burbine or putting him in a line-up and that they were through with him for the night." *Id.* at 417, 106 S.Ct. at 1139 (internal quotation marks omitted). In fact, Burbine was questioned less than an hour after the lawyer's phone call and he confessed to murder. Under these facts, the Supreme Court declined to find a Fourteenth Amendment violation. However, the Court left open the possibility that a due process violation could be established under "more egregious" police misconduct. *Id.* at 432–34, 106 S.Ct. at 1146–48.

Ajabu argues that the State officials' failure to inform him of Roberts's phone call prior to the interrogation in this case is more offensive than the circumstances in *Burbine*

for two principal reasons: (1) the police and prosecutors "conspired" to withhold this information from Ajabu and to deny him "meaningful legal advice"; and (2) the prosecutors allegedly violated the Indiana Rules of Professional Conduct under these facts. The evidence does show a group discussion and agreement not to tell Ajabu about Roberts's phone call. However, this was not a "conspiracy" with an unlawful objective. Rather, the prosecutors and police appear to have grounded their actions on their reading of *Burbine*. Intentional or knowing deception by an attorney might present grounds for professional discipline, but this appeal is not the proper forum for that determination. Nor does the involvement of an attorney among the State officials appear to play a role in the due process analysis. By referring to the degree of deception as the controlling factor in adjudicating a due process claim, *Burbine* implied that what the lawyer is told in response to the inquiry is more important than whether another lawyer assists in the deception, although that may also be relevant depending on the facts.

 In any event, the degree of deceit necessary to implicate the Fourteenth Amendment is simply not apparent in this case. The actions of the prosecutors and police are certainly more benign than what occurred in *Burbine*. A U.S. Supreme Court precedent appeared to support the decision not to halt the interrogation. And, unlike *Burbine*, Roberts was not told that Ajabu would not be questioned, only that the "appropriate people" would be informed of his inquiry. After Ajabu requested a lawyer later that day, he was not questioned further. Only then was Ajabu told that Roberts had called. We share the Supreme Court's concern for the appearance of what occurred, but *Burbine* itself found no due process violation on more offensive facts. U.S. Supreme Court authority is controlling on issues of federal constitutional law. Accordingly, Ajabu's claim on this point fails.

## III. Validity of the Sentence of Life Without Parole

 In papers filed before trial, the State indicated it would seek the death penalty if

Ajabu was convicted of murder. Because Ajabu was convicted by a jury, he ordinarily would have been entitled to a non-binding jury recommendation on whether the death penalty, life in prison without parole, or neither, was appropriate. IND.CODE §§ 35–50–2–9(d) & (e) (1993).[16] On the day the jury was to reconvene for the sentencing hearing, the State and Ajabu agreed that the death penalty request would be withdrawn in exchange for Ajabu's forfeiting his statutory right to a jury recommendation. The trial court accepted this agreement, discharged the jury, and conducted the sentencing hearing alone. The court found that the State had proved the existence of three statutory aggravating circumstances: (1) Ajabu committed the murder by intentionally killing the victims while committing or attempting to commit burglary and robbery, IND.CODE §§ 35–50–2–9(b)(1)(B) & (G)[17]; (2) Ajabu committed another murder at any time, IND. CODE § 35–50–2–9(b)(8); and (3) Ajabu's victims were victims of criminal confinement, an offense for which he was convicted at trial, IND.CODE § 35–50–2–9(b)(12)(C). The first two factors were charged in the death penalty information and the third was not.

■ The trial court's reference to these death penalty factors was correct. In imposing a death penalty, only the death penalty statutory aggravating circumstances are to be considered. *Bivins v. State*, 642 N.E.2d 928, 953–57 (Ind.1994). The statute provides that life without parole is imposed under the same standards and is subject to the same requirements. The court found as mitigating evidence Ajabu's lack of prior criminal history and his apology to the victims' families at the sentencing hearing. After finding that the aggravating circumstances outweighed the mitigating circumstances, the court sentenced Ajabu to life in prison without parole for each murder conviction.

## A. Findings required for a (b)(1) aggravating circumstance

■ Ajabu contends that the first aggravating circumstance is not supported by the evidence because he claims there was no showing that he took a life, attempted to take a life, or intended to take a life. His principal argument in requesting a lesser sentence was that he was at most an accomplice and did not himself kill the victims. The (b)(1) aggravating factor required proof beyond a reasonable doubt that Ajabu "committed the murder by intentionally killing the victim[s] while committing or attempting to commit" burglary or robbery. IND.CODE §§ 35–50–2–9(b)(1)(B) & (G). In applying the (b)(1) aggravating circumstance to the facts of this case, the trial court concluded that the statute's culpability requirements—both *mens rea* and *actus reus*—were coextensive with the minimum requirements of the Eighth Amendment. The court drew on *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) for the proposition that Ajabu could constitutionally be sentenced to death under the statute, and *a fortiori* life without parole, if the State proved that he was a major participant in the murders and displayed a reckless indifference to human life. The court then made detailed factual findings in support of its conclusion that both *Tison* elements—major participation and

16. Unless otherwise noted, all references here are to the 1993 version of the death penalty statute that was in effect at the time of the murders in this case. In the sentencing order, the trial court quoted from the 1995 version and appears to have relied on it in imposing life without parole for each murder conviction. "One of our well established rules of criminal law is that the controlling law is that which is in effect at the time the crime is committed." *Smith v. State*, 675 N.E.2d 693, 695 (Ind.1996) (citation omitted). Accordingly, the trial court should use the 1993 version on remand. Because we remand on other grounds, we need not address whether the use of the wrong version of the statute was harmless error. The sections of the statute at issue today are substantively unchanged in the 1995 version.

17. Due to an apparent scrivener's error, the trial court actually found that subsection (F) of the (b)(1) aggravating circumstance, and not subsection (G), had been proved beyond a reasonable doubt. Subsection (F) refers to rape and not robbery. We assume that the trial court intended to find that subsection (G)—robbery—had been proved beyond a reasonable doubt because the court wrongly labeled subsection (G) as subsection (F) in quoting from the sentencing statute. An accurate excerpt from the controlling 1993 version of the statute in a new sentencing order will cure this error on remand.

reckless indifference to human life—were met here.

### 1. *"Major participation" is the required actus reus for subsection (b)(1)*

██ The trial court applied the "major participation" required by *Tison* as the standard for *actus reus* necessary for imposition of the death penalty or life without parole under subsection (b)(1) of the Indiana statute. We agree that the "major participation" required by *Tison* as a matter of Eighth Amendment and Fourteenth Amendment law is also the requisite *actus reus* under subsection (b)(1). We reach that conclusion based on the language of the statute illuminated by its legislative history in light of *Tison.*

██ Because the jury was instructed on accomplice liability in this case, it may have convicted Ajabu of murder under an accomplice theory. By its terms, the accomplice statute specifies one means by which a person can "commit" an offense. IND.CODE § 35–41–2–4 (1993). By virtue of the accomplice statute, mere tangential involvement in the killing can be sufficient to "commit murder." *See generally Johnson v. State,* 687 N.E.2d 345, 349 (Ind.1997) (person who comforted or assisted the perpetrator after the offense may be convicted as an accomplice). However, the *actus reus* element of subsection (b)(1) is not that the defendant "commits murder" in the course of one of the listed felonies. Rather, the death penalty (b)(1) standard—"commit[s] the murder by intentionally killing"—is somewhat more restrictive than the acts needed for commission of the crime.

██ Ajabu correctly points out that the intent and actions of confederates cannot be imputed to the defendant in determining whether the (b)(1) aggravating circumstance has been proved beyond a reasonable doubt. *Landress v. State,* 600 N.E.2d 938 (Ind.1992). He is not correct, however, in contending that a "non-triggerman" can never be subjected to the death penalty statute by reason of subsection (b)(1). A person who substantially participates but does not deliver the fatal blow may still fall within the statute's scope. Concerted action that produces death can rise above simple accomplice liability and render the defendant eligible for death or life without parole even if someone else delivers the fatal blow. *See, e.g., Miller v. State,* 623 N.E.2d 403 (Ind.1993) (defendant's plan that the victim would be killed and participation in the abduction and assault of the victim was an intentional killing within subsection (b)(1) even though a co-conspirator fired the fatal gunshot). We conclude that the trial court correctly applied the "major participation" test as the standard for the required act under subsection (b)(1). If major participation is shown under subsection (b)(1), it is irrelevant whether the defendant "commits" the crime by reason of the murder statute or by reason of the accomplice statute.

██ *Tison* declined to elaborate the precise circumstances or conduct constituting major participation, but the facts of that case make clear that the term includes at least (1) active involvement in any crimes surrounding the commission of the murder; and (2) physical presence during the entire sequence of criminal activity culminating in the murder and flight from the scene. *Tison,* 481 U.S. at 158, 107 S.Ct. at 1688. As discussed below, the trial court's careful analysis of *Tison* and findings on participation satisfy subsection (b)(1).

██ Although this case involves life without parole, death penalty jurisprudence is instructive in construing subsection (b)(1) because subsection (b)(1) applies equally and without differentiation to both sentences. *Tison* establishes that "major participation" in the killing, coupled with a culpable mental state, is needed for a death penalty to satisfy the Eighth Amendment. Indeed, vicarious liability in the capital context raises concerns about proportionality: "While an accomplice may be found guilty of the crime largely executed by his principal, it does not follow that the same penalty is appropriate." *Martinez Chavez v. State,* 534 N.E.2d 731, 735 (Ind.1989). The perpetrator who delivers the fatal blow or shot is plainly a major participant, but not all accomplices are necessarily major participants. It is also clear that accomplice liability in some cases—for example, where the defendant's involvement consists only of driving the getaway car, *cf. Enmund*

*v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)—may not rise to the level of major participation so as to satisfy subsection (b)(1) or the Eighth Amendment. Although the "intentionally killing" phrase of subsection (b)(1) appeared in the Indiana death penalty statute before *Tison* was decided in 1987, the General Assembly has amended that subsection three times since 1987, and each time left that language unchanged in light of *Tison.*[18] Because we presume the General Assembly did not intend to legislate in conflict with the federal constitution,[19] this federal constitutional backdrop, in concert with our recognition of non-triggerman eligibility under subsection (b)(1), fortifies our conclusion that the conduct required to satisfy that aggravating circumstance is coextensive with *Tison*—"major participation" in the killing.

■ The legislature presumably could impose life without parole on a broader range of participants than *Tison* permits for the death penalty.[20] However, by inserting life without parole into the death penalty statute the legislature chose to impose life without parole as an alternative punishment applicable only to death penalty eligible convictions. It is therefore subject to the same construction as in death penalty cases. Other state supreme courts have reached similar conclusions where the relevant statute provided that life without parole was subject to the same proof required to impose a death sentence. *See, e.g., People v. Estrada,* 11 Cal.4th 568, 46 Cal.Rptr.2d 586, 590, 904 P.2d 1197, 1201 (1995) (*Tison* does not stand for the proposition that reckless indifference to human life must be shown to impose life without parole, but that element was required because the statute at issue mimicked *Tison's* language).

### 2. Subsection (b)(1) requires intentional conduct

■ The sentencing in this case must comport not only with the Eighth Amendment but also with the terms of subsection (b)(1). The State contends that *Tison* culpability is all that need be shown to prove the (b)(1) aggravating circumstance beyond a reasonable doubt.[21] We do not agree. "A

---

18. 1989 Ind. Acts, P.L. 296, § 2 (adding "dealing in cocaine or a narcotic drug" to list of felonies in subsection (b)(1)); 1993 Ind. Acts, P.L. 230, § 5 (same for "carjacking"); 1994 Ind. Acts, P.L. 158, § 7 (same for "criminal gang activity").

19. *City of Evansville v. International Ass'n of Fire Fighters, Local 357,* 516 N.E.2d 57, 59 (Ind.1987) ("When alternate meanings are available, it would seem illogical to attach a meaning which would deprive the statute being interpreted of all effect or purpose."). *See generally* 2A SUTHERLAND STATUTORY CONSTRUCTION § 45:11, at 49 (5th ed. 1992 & Supp.1997) ("When possible, statutory provisions should be construed in such a way as to avoid unconstitutionality rather than simply void them on the basis of an interpretation which renders them constitutionally infirm.") (footnote omitted).

20. As noted above, a person convicted of murder, depending on the facts, can be less than a major participant in the offense. Although *Tison* bars a death penalty under those circumstances, the Supreme Court has never addressed whether *Tison* would prohibit life without parole in that situation. There is every indication that it does not. In *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court rejected an Eighth Amendment challenge to a mandatory sentence of life without parole for possession of 672 grams of cocaine. That case is important here for two reasons. First,

*Harmelin* explicitly rejected the defendant's invitation to extend capital sentencing doctrine—in that case the requirement of individualized sentencing as opposed to *Tison* limits on the acts or mental elements required—to life without parole. *Id.* at 995–96, 111 S.Ct. at 2701–02. The few lower courts that have confronted *Tison's* possible application outside the capital context have concluded that it does not apply to sentences of life without parole. *See, e.g., Rosenberg v. Henderson,* 733 F.Supp. 577 (E.D.N.Y.1990). Second, if life without parole for cocaine possession does not violate the Eighth Amendment, *a fortiori* life without parole for an intentional killing is constitutional even where, as in this case, the defendant's conviction may be based on accomplice liability at the guilt phase.

21. For this proposition, the State cites *Rouster v. State,* 600 N.E.2d 1342 (Ind.1992) and *Townsend v. State,* 533 N.E.2d 1215 (Ind.1989). Neither case is on point. Rather than dealing with the evidentiary showing required under the statute, *Rouster* discussed *Tison* in the context of whether the State "demonstrated the level of culpability required by the Eighth Amendment." *Rouster,* 600 N.E.2d at 1350. *Townsend* held that the defendant was eligible for the death penalty under *Tison* as a matter of federal constitutional law, and under the (b)(1) aggravating circumstance due to sufficient evidence of intentional killing. *Townsend,* 533 N.E.2d at 1227. Al-

person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." IND.CODE § 35–41–2–2(a) (1993). In contrast, "reckless indifference to human life," as used in *Tison*, 481 U.S. at 150–51, 107 S.Ct. at 1684–85, is akin to the definition of "recklessly" in the Indiana criminal code: "A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result...." IND. CODE § 35–41–2–2(c) (1993). In requiring a showing that the defendant committed the murder by "intentionally" killing the victim, the General Assembly therefore clearly mandated a higher degree of mental culpability than that permitted in *Tison*. Our cases have repeatedly emphasized that the (b)(1) aggravating factor requires a finding of intentional killing.[22]

**B.** *The trial court's findings do not show intentional killing*

■ In sum, the trial court found that Ajabu (1) helped plan and substantially participated in the robbery and burglary scheme that led to the murders; (2) was present and armed with a loaded handgun when the violence escalated; and (3) "had to be aware that the probability of the victims being killed was very high," and "once Chris James is killed, the defendant had to know that Nicholas and Lisa Allemenos would be killed." The (b)(1) aggravating circumstance requires that Ajabu killed "intentionally." The trial court's finding of major participation in the killings is well documented and easily satisfies the *actus reus* requirement of subsection (b)(1). But the findings do not establish that Ajabu acted "intentionally" within the meaning of the (b)(1) aggravating circumstance. *Cf. Games v. State*, 535

N.E.2d 530, 544–45 (Ind.1989) (death sentence upheld where trial court made finding that defendant intentionally killed the victim during course of a robbery). There is no conclusion that Ajabu's mental culpability rose to that level. The findings as to Ajabu's state of mind mirror almost word for word the definition of "knowingly" in the Indiana criminal code: "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." IND.CODE § 35–41–2–2(b) (1993). Perhaps because it assumed that *Tison*'s lower standard of "reckless indifference to human life" was sufficient for subsection (b)(1), the trial court found at most a "knowing" murder and not an intentional killing.[23] However, because there is no finding that Ajabu intentionally killed any victim in this case, the (b)(1) aggravating circumstance is invalid on this record.

**C.** *Proper considerations in resentencing*

■ *Harrison v. State*, 644 N.E.2d 1243 (Ind.1995) set forth guidelines trial courts are to follow in making findings pursuant to the death penalty statute. In that case, defendant Harrison was convicted of felony murder and the State sought the death penalty. Although the trial court concluded in the sentencing findings that Harrison "committed the murder by intentionally killing the victim ... while committing or attempting to commit Arson," we remanded for a more specific sentencing order because, among other reasons, the record was unclear on whether the trial court distinguished between the *mens rea* required for felony murder, and the *mens rea* necessary to establish the (b)(1) aggravating circumstance. *Id.* at 1262–64. We reiterated that the latter required an intentional killing. *Id.* at 1263 n.

---

though the same evidence may often bear on whether the death penalty statute and the Eighth Amendment are satisfied, the two inquiries are quite distinct and nothing in *Townsend* suggests otherwise.

**22.** *Harrison v. State*, 644 N.E.2d 1243, 1263 & n. 30 (Ind.1995); *Landress v. State*, 600 N.E.2d 938 (Ind.1992); *Fleenor v. State*, 514 N.E.2d 80, 92 (Ind.1987) (rejecting contention that subsection (b)(1) does not require "specific" intent to kill).

**23.** Ajabu was charged with, and convicted of, "knowingly" killing the victims. IND.CODE § 35–42–1–1(1) (1993) (murder can occur either knowingly or intentionally). This verdict does not preclude a finding of intentional killing for capital sentencing purposes. *See, e.g., Fleenor v. State*, 622 N.E.2d 140, 150–51 (Ind.1993). However, it does not suffice to show that Ajabu intentionally killed the victims so as to satisfy the (b)(1) aggravating circumstance. *Minnick v. State*, 544 N.E.2d 471, 483 (Ind.1989) (DeBruler, J., concurring and dissenting).

30. *Harrison* indicated that the court's findings should be formulated based on the following factors:

> The trial court's statement of reasons (i) must identify each mitigating and aggravating circumstance found, (ii) must include the specific facts and reasons which lead the court to find the existence of each such circumstance, (iii) must articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence, and (iv) must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime.

*Id.* at 1262 (citations omitted).

■ The problem in *Harrison* was that the trial court found an intentional killing without providing "specific facts and reasons" in support of that conclusion. The problem in this case is that the trial court made detailed factual findings without concluding whether this added up to intentional killing. Indeed, the findings suggest a failure to prove beyond a reasonable doubt that Ajabu's participation in the events intentionally rather than knowingly or recklessly led to death. However, because the trial court's findings were predicated on *Tison* rather than the Indiana statute, we express no view on whether the evidence adduced at trial and at the sentencing hearing could support findings of intentional killing. We hold only that the trial court must make the findings required to establish the (b)(1) aggravating circumstance beyond a reasonable doubt. Imposition of the death penalty or life without parole requires scrupulous compliance with each statutory step. *Id.* at 1263–64.[24]

Ajabu does not challenge the two other aggravating circumstances used to support the life sentences. Therefore, reweighing will take place on remand irrespective of whether the (b)(1) aggravating factor is found to be proved beyond a reasonable doubt. The only open question is the quantum of aggravating evidence to be weighed against the mitigating factors. Two other aspects of the sentencing order will require clarification on remand. First, the trial court found the (b)(8) aggravating circumstance to be proved by virtue of Ajabu's conviction for Christopher James's murder. However, the order does not state which of the other two murder convictions this factor was applied against as an aggravating circumstance—whether with respect to both Lisa and Nicholas Allemenos, or just one of the two.[25] Second, the order does not comply with *Harrison*'s mandate that the trial court set forth its "personal conclusion that the sentence is appropriate punishment for this offender and this crime." *Id.* at 1262.

■ This case is remanded for a new sentencing order on the murder counts and, specifically, consideration on the current record of the following issues: (1) new or revised findings as to whether the (b)(1) aggravating circumstance was proved beyond a reasonable doubt; (2) clarification of the (b)(8) aggravating circumstance findings; (3) determination whether the mitigating circumstances are outweighed by the aggravating circumstances for each murder conviction, so as to justify imposition of life without parole; and (4) a personal statement by the court that life in prison, if that sentence is imposed, is appropriate punishment for this offender and this crime. In drafting the sentencing order, the trial court is directed to use the 1993 version of the death penalty statute. *See* IND.CODE § 35–50–2–9 (1993) and discussion *supra* note 16.[26]

24. *Harrison* was a capital case that emphasized that the requirement of findings to support a death sentence was "more stringent than in noncapital sentencing situations." *Harrison,* 644 N.E.2d at 1262. However, *Harrison*'s guidance on the findings that must be made under Indiana Code § 35–50–2–9 applies equally here because, as noted above, the same statutory framework controls a sentence of life without parole.

25. The death penalty information alleged that Ajabu "did intentionally kill LISA ALLEMENOS after having intentionally killed CHRIS JAMES and/or NICHOLAS ALLEMENOS."

26. Ajabu raises one other sentencing issue. He contends the trial court erred when it admitted the deposition testimony of James Walls at the sentencing phase of the trial. Walls was also charged as a result of these same events but was tried separately. Despite testifying under a grant of use immunity, when called to the witness stand Walls refused to answer any questions about the events surrounding the murders. After the trial court held him in contempt, the State

## Conclusion

Kofi Modibo Ajabu's convictions for three counts of murder, three counts of criminal confinement, three counts of robbery, and one count of burglary are affirmed. This case is remanded for further proceedings in the trial court consistent with this opinion.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

SELBY, J., concurs with separate opinion, in which DICKSON, J., concurs.

SELBY, Justice, concurring with separate opinion.

I agree with the majority; however, I write separately to address the actions of the police and prosecutors in this case. This case does not involve a personal appearance by the lawyer at the stationhouse or a request to speak with the suspect. The Court's holding today should not be understood to apply to those circumstances, which might present different considerations depending on the factual context or constitutional provision at issue, as the Court's footnote 5 implies. While it may be true that the law enforcement officials did not act in a manner egregious enough to constitute a violation of defendant's constitutional rights under *Burbine*, we should not condone such conduct.

DICKSON, J., concurs.

moved to admit the deposition transcript in lieu of Walls's live testimony. Ajabu argues that Walls was not "unavailable" for purposes of Indiana Evidence Rule 804(b)(1). Unavailability for purposes of the Rule can be established in several ways, including where the witness "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Ind. Evidence Rule 804(a)(2). Ajabu maintains that the State failed to make a "good faith effort" to compel Walls to testify and, specifically, should have threatened to reopen a sentencing agreement arising out of the prosecution of Walls for his involvement in the crimes in this case. Ajabu's trial counsel objected to the admission of the transcript on several grounds, but did not challenge the trial court's finding that Walls was unavailable. It is well settled that a party may not object on one ground at trial and rely on a different ground on appeal. *See, e.g., Jester v. State*, 551 N.E.2d 840, 843 (Ind.1990). As the State contends, Ajabu's new argument is therefore foreclosed at this point.