

FILED

Jun 08 2023, 10:47 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court



I N T H E

# Indiana Supreme Court

Supreme Court Case No. 21S–LW–333

## Donald R. Owen, Jr.,

*Appellant,*

–v–

## State of Indiana,

*Appellee.*

Argued: October 11, 2022 | Decided: June 8, 2023

Direct Appeal from the Elkhart Circuit Court, No. 20C01–1912–MR–6

The Honorable Michael A. Christofeno, Judge

**Opinion by Justice Slaughter**

Chief Justice Rush and Justices Massa, Goff, and Molter concur.

**Slaughter, Justice.**

Defendant, Donald R. Owen, Jr., was an acknowledged gang leader in Elkhart County. When members of the local Latin Kings gang believed a woman among them was a police snitch, they interrogated her, roughed her up, and eventually killed her—but not before contacting Owen, who later arrived at the scene and both supervised and participated in torturing and killing her brutally. Once she was dead, Owen oversaw cleaning up the crime scene. Then he stuffed her corpse into a trash can, drove it to Michigan, hid it in a ditch, and covered it with weeds and camouflage.

A jury convicted Owen of murder, felony robbery resulting in serious bodily injury, and two counts of criminal confinement. During sentencing, the jury found three statutory aggravators beyond a reasonable doubt and recommended a sentence of life without parole for the murder conviction, which the trial court adopted. In this direct appeal, Owen argues there was insufficient evidence that he was a major participant in the murder and insufficient evidence that he committed the murder in furtherance of a criminal organization. He also argues the trial court abused its discretion by declining to adopt his proposed jury instructions and by relying on sentencing factors not supported by the record. We affirm.

I

A

One evening in October 2019, Kim Dyer visited a house in Elkhart County. She brought an acquaintance, Rob Porter, a known drug dealer, who planned to sell marijuana to others at the house. Those others included Mario Angulo and Matthew Murzynski, both members of the Latin Kings gang. Everyone at the house that evening was socializing and using drugs.

At some point that night, the mood turned. Angulo, Murzynski, and another woman named Hope Lowry suspected Dyer of associating with a rival gang and began searching her possessions. They found a notebook containing a diagram of the house and a list of names, including people at the house who were Latin Kings members. Murzynski then directed Dyer

to the basement. There, they interrogated her, accused her of being a police snitch, and began roughing her up.

Angulo then contacted another Latin Kings member, Defendant, Donald Owen, and asked him to come by because things were getting "serious". Angulo also told Owen that he may need to bring a weapon, and that he had an opportunity to commit a robbery. Owen pressed Angulo for more details, but Angulo was in over his head and needed Owen's help: "I wish I could tell you, but I can't . . . I need your help".

After a few hours Tylor Saunders, the house's owner, went to the basement and saw that Dyer looked distraught, had puffy cheeks, a busted lip, and a red face. She "looked like she had been roughed up." Dyer's boyfriend, Jose Lopez, Jr., tried to get Angulo and Murzynski to release Dyer, but they said they could not let her go for fear she would go to the police. At that time, Porter was guarding Dyer in the basement and holding a rifle. Lopez then left the house. Murzynski told Saunders the situation with Dyer was a "big Latin King thing".

Later that night, Angulo and Lowry turned on Porter. They accused him of raping Dyer while they were in the basement. Then they forced Porter back downstairs, where he saw Dyer. She was zip-tied and looked "like she got her ass kicked." And her mouth was taped shut to muffle her cries and screams.

About this time, Owen arrived at the house, carrying a knife and wearing surgical gloves as well as a bandana that covered his face. He took control of the situation. According to Porter, "when [Owen] said something to [Angulo and Murzynski], they listened. And they basically . . . [looked] to him for guidance." Owen later said he had been called to "lay the house down", which means to "show your authority" and that "actions stop[ped]" when he came in. Owen acted "like he [was] the boss."

Owen promptly robbed Porter of his jewelry, beat him, and zip-tied him. Owen then began questioning Dyer about being an informant. During the questioning, Owen removed his bandana and said "there was no point in having it on now because [Dyer knew she was] gonna die."

After his questioning, Owen returned upstairs to the kitchen. Murzynski took Porter up to the kitchen, where Owen beat him again. Then Murzynski took out a cellphone and made Porter record a video in which he accepted blame for what happened to Dyer. After the forced confession, Owen made Porter crawl into a nearby dog cage and ordered him to put out a cigarette on his own tongue. Finally, Owen had Porter write down the names of his children and threatened to kill his family if he ever told anyone what happened that night. While in the kitchen, Porter saw Owen and Murzynski perform the Latin Kings handshake, forming a crown with their hands.

Porter was then sent back to the basement. He heard Owen tell Murzynski to "[m]ake him [Porter] go to sleep and make her [Dyer] go to sleep." In the basement, Porter saw that Dyer was still zip-tied, beaten, duct-taped, and her head was shaved. Porter also overheard Murzynski and Angulo discussing they had cut off some of her toes. Murzynski and Angulo then began pouring bleach down Dyer's throat with a hose, and they duct-taped her body from her head to her shoulders until she looked like a "mummy". Angulo told Porter he would need to help strangle Dyer if he ever wanted to leave the house alive. As Porter helped Angulo strangle Dyer with the hose, Owen entered the basement. Porter eventually let go and saw Dyer gasp for air. As Porter tried to leave the house, Owen followed him outside and cut his wrist with a bowie knife, leaving a deep cut.

Owen returned to the basement and was there when Angulo grabbed a broken beer bottle and slit Dyer's throat. She fell to the ground and "flop[ped] like a fish". Owen never intervened. After the murder, Owen "tagged" the room by spraying his name, "King Duke", and other Latin Kings symbols on the basement walls. He then led the effort to clean up the messy crime scene. He put Dyer's body into a trash can, moved the trash can into a car, and helped drive it to Michigan, where he hid it in a ditch and covered it in weeds and camouflage.

Lopez, Dyer's boyfriend, later heard that she had been killed. He returned to Saunders's house, where he found all the carpeting and furniture removed and the walls still covered in graffiti. Lopez told

officers that Dyer had been killed and directed them to Saunders's house. The officers found Dyer's body in Michigan. The autopsy revealed she had sustained as many as eighty-three distinct, gruesome injuries. From the autopsy results, the medical examiner concluded Dyer died as a result of multiple, contributing injuries, "including the blunt force injuries, the sharp force injury to the neck, and the asphyxia".

B

Following Dyer's murder, Owen fled to Texas, where he was later arrested, and then transported back to Elkhart County for trial. The State charged him with murder, Level 2 felony robbery resulting in serious bodily injury, and two counts of Level 3 felony criminal confinement. The State also notified Owen of its intent to seek life imprisonment without parole. The jury ultimately found Owen guilty of all charges.

Between the guilt and penalty phases of the trial, Owen asked the trial court to give two non-pattern jury instructions involving "major participant" status. The trial court declined to give either proposed instruction because "none of the instructions [were] pattern instructions" and "the proposed instructions [were] already part of the cumulative instructions, which the Court [was going to] give on phase II of the trial."

During the penalty phase, the State introduced testimony from two witnesses. The first was Julie Koets, who worked with Michiana Community Corrections. She testified that during October 2019, Owen was serving out a sentence through the Elkhart County Jail for unrelated crimes. The Elkhart County sheriff controls the jail. But rather than serve his sentence in custody, Owen had qualified for in–home detention through the local community corrections and was on this detention when he killed Dyer.

The State's other witness, Lieutenant Kyle Dombrowski of the South Bend Police Department, testified about criminal organizations in Indiana generally and the Latin Kings specifically. He explained that factors such as self-admission, hand signs or handshakes, tattoos, and graffiti are used to identify if someone is affiliated with a criminal organization. After testifying that the Latin Kings is a criminal organization, Dombrowski

explained that the Latin Kings view talking to law enforcement as a "cardinal sin".

Dombrowski also discussed the symbols spray-painted on the walls of Saunders's basement. He confirmed that the paint's color, the name "King Duke", and the crown symbol are all "particularly associated" with the Latin Kings. The purpose of this "tagging" was "to broadcast that association, whether or not only for themselves or whoever's involved in doing it, but for the organization itself."

Under Indiana Code section 35-50-2-9(a), the State may seek a life-without-parole sentence for murder by proving beyond a reasonable doubt the existence of at least one of the aggravating circumstances listed in subsection 9(b). Here, the jury found the State had proved the existence of several such aggravating circumstances: (1) that Owen committed the murder by aiding, inducing, or causing the intentional killing of the victim while committing or attempting to commit criminal confinement; (2) that Owen committed the murder by aiding, inducing, or causing the intentional killing of the victim while committing or attempting to commit criminal organization activity; and (3) that Owen was under the custody of a county sheriff when he committed the murder. The jury also found that the aggravating circumstances outweighed any mitigating circumstances and recommended a life-without-parole sentence.

Upon the jury's recommendation, the trial court sentenced Owen to life without parole for murder, thirty years for robbery resulting in serious bodily injury, and sixteen years for each count of criminal confinement, all of which the trial court ordered to be served consecutively. The court considered mitigating circumstances for all four convictions but considered only the statutory aggravators for the murder charge. For mitigating circumstances, the court found that Owen showed remorse, committed the crime at a young age, grew up without good parents, and had a history of addiction. For the statutory aggravators, the court agreed with the jury and found the State had proved them beyond a reasonable doubt and they outweighed any mitigating circumstances.

As for Owen's non-murder convictions, the court found numerous aggravating circumstances, including his litany of juvenile adjudications,

felony offenses that were waived into adult court, and community-corrections violations. Other aggravating circumstances the court found were Owen's affiliation with the Latin Kings; the torture of Kim Dyer while she was alive, including over eighty brutal injuries; his torture of Porter; his failure to stop Dyer's murder; his disposal of Dyer's body in a trash can and later attempt to hide her body in a remote area; and his attempt to escape justice by fleeing to Texas. Together, these "heinous, horrific, and depraved" actions "indicate[d] to the Court that [Owen was] not likely going to be rehabilitated" and that he had "a total disregard for the law, authority and society." The court reasoned that these "aggravators taken alone or in conjunction with the others" warranted the imposition of an enhanced sentence.

Owen appealed, and his life-without-parole sentence means the appeal comes directly to us, bypassing the court of appeals. Ind. Appellate Rule 4(A)(1)(a). After we heard argument, Owen sought from us a writ in aid of our jurisdiction. His counsel represented that she learned belatedly the trial court had recorded but not transcribed the trial's sidebar conferences. Counsel asked us to stay proceedings so the court reporter could transcribe the sidebars and to give her adequate time to review the amended transcript before deciding whether those sidebars revealed any additional grounds to obtain appellate relief for Owen. We ordered the trial court to produce an amended transcript of the sidebars and told Owen to either file a supplemental brief or notify us that he would not file a further brief within thirty days of the date the court reporter filed the amended transcript. The court reporter filed the amended transcript with the trial-court clerk on February 13, 2023—meaning Owen had until March 15 to make either of the required filings with us. Owen did not file his supplemental brief until March 20. His untimely brief means any supplemental arguments are waived.

Were we even to consider the additional arguments Owen raised in his supplemental brief, we would find them to be without merit. Owen argues he is owed a new trial because the sidebar transcripts are inadequate and do not comply with Indiana Criminal Rule 5. That rule requires trial courts to keep an adequate record of the proceedings to ensure a proper, accurate, and complete record for appeal. The trial court

violated due process, he believes, by failing to abide by Criminal Rule 5. But, as the State notes, the trial court explained from the outset that courtroom acoustics made it a challenge to record sidebar conversations effectively. The court's proposed solution was for the parties to approach the bench if they had an objection. At their sidebar, the objecting lawyer would discuss the objection briefly and the proffering counsel would respond. Once the sidebar concluded, the trial court would state the objection and announce its ruling on the record. The trial court also invited the parties to object on the record if the court misstated the substance of a party's objection. For more complicated objections, the court suggested holding hearings outside the presence of the jury, where the proceedings would be recorded and transcribed. Owen's counsel agreed to this procedure.

By accepting the trial court's procedure for dealing with objections, Owen waived any objection to its application here. Owen failed to object to this procedure below despite the court's invitation and the opportunity to do so. The only exception to this waiver is to review the trial court's actions for fundamental error. But Owen waived any claim of fundamental error by not arguing it in his supplemental brief. See *Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011) (failure to allege fundamental error in principal appellate brief results in waiver of issue). Because Owen's supplemental briefing preserved no valid issues for our review, we proceed to the merits of the dispute, as set forth in the parties' original briefing.

II

Owen asserts three arguments in this direct appeal: one challenges both his murder conviction and the corresponding life-without-parole sentencing aggravator; two other arguments challenge his sentence. The first argument is that (1) there was insufficient evidence that Owen was a "major participant" in the murder of Dyer, and (2) there was insufficient evidence that Owen murdered Dyer while also satisfying one of the statutory aggravators for imposing a life-without-parole sentence. We hold there was sufficient evidence both to find that Owen was a major participant and to support two of the statutory aggravators. The second

argument is that the trial court abused its discretion in declining to instruct the jury as Owen proposed. We hold there was no abuse of discretion. The third argument is that the other aggravating factors, not relating to the life-without-parole sentence, were not supported by the record. We hold the record supports these other aggravators and thus affirm the trial court's judgment in all respects.

A

Sufficiency-of-the-evidence arguments trigger a deferential standard of appellate review, in which we "neither reweigh the evidence nor judge witness credibility, instead reserving those matters to the province of the jury." *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018) (citing *Drane v. State*, 867 N.E.2d 144, 146–47 (Ind. 2007)). We consider only "the probative evidence and reasonable inferences supporting the verdict". *Matheney v. State*, 583 N.E.2d 1202, 1208 (Ind. 1992) (citing *Braswell v. State*, 550 N.E.2d 1280, 1284 (Ind. 1990)). From this posture, "we determine whether the evidence constitutes substantial evidence of probative value from which a reasonable trier of fact could find the existence of the aggravator beyond a reasonable doubt." *Washington v. State*, 808 N.E.2d 617, 626 (Ind. 2004) (citing *Fleenor v. State*, 622 N.E.2d 140, 151 (Ind. 1993)).

Owen argues there was insufficient evidence that he was a major participant because he did not actually kill Dyer himself and was not there for each and every event leading up to her murder. He further argues there was insufficient evidence that he murdered Dyer to further the interests of the Latin Kings gang. We disagree and address each argument in turn.

1

Indiana Code section 35-50-2-9(b)(1) permits a life-without-parole sentence only if "the defendant has committed a murder by 'intentionally' killing a victim while committing another crime". *Pittman v. State*, 885 N.E.2d 1246, 1257 (Ind. 2008) (quoting I.C. § 35-50-2-9(b)(1)). In *Ajabu v. State*, we reviewed the findings required to support aggravating circumstances where the defendant was convicted under an accomplice theory of criminal liability. 693 N.E.2d 921, 936 (Ind. 1998). Drawing on

*Tison v. Arizona*, we concluded that the "'major participation' required by *Tison* as a matter of Eighth Amendment and Fourteenth Amendment law is also the requisite *actus reus* under subsection (b)(1)." *Id.* at 937 (citing *Tison v. Arizona*, 481 U.S. 137 (1987)). Although the actions and intentions of confederates cannot be imputed to a defendant, "[a] person who substantially participates but does not deliver the fatal blow may still fall within the statute's scope. Concerted action that produces death can rise above simple accomplice liability and render the defendant eligible for death or life without parole". *Ibid.* (citing *Miller v. State*, 623 N.E.2d 403, 412–13 (Ind. 1993) (defendant's role in planning and carrying out a plan to kill and abduct victim was an intentional killing within subsection (b)(1) even though a co-conspirator fired the fatal gunshot)). In *Ajabu*, we held the trial court's findings that the defendant "helped plan and substantially participated in the robbery and burglary scheme that led to the murders [and] was present and armed with a loaded handgun when the violence escalated . . . . easily satisfie[d] the *actus reus* requirement of subsection (b)(1)." *Id.* at 939.

Additionally, by requiring that the killing be "intentional", our general assembly has imposed a higher degree of culpability than the Supreme Court mandated in *Tison*, which required only that the killing be committed with a "reckless indifference to human life". *Id.* at 939 (quoting *Tison*, 481 U.S. at 151). In contrast, our own caselaw emphasizes that the 9(b)(1) aggravating factors require a finding of intentional killing. *Ibid.* (concluding that defendant's awareness that "the probability of the victims being killed was very high" was not sufficient to prove the killing was intentional and satisfy 9(b)(1)'s *mens rea* requirement). "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." *Id.* at 938–39 (quoting I.C. § 35-41-2-2(a) (1993)). To satisfy 9(b)(1), the defendant must have had the conscious objective to murder the victim and to be a major participant in effectuating the murder. *Id.* at 938–39.

Such major participation in a murder requires, at least, the defendant's "(1) active involvement in any crimes surrounding the commission of the murder; and (2) physical presence during the entire sequence of criminal activity culminating in the murder and flight from the scene." *Id.* at 937

(citing *Tison*, 481 U.S. at 158). While the perpetrator who delivers the fatal blow is plainly a major participant, an accomplice need not be the "trigger man" to qualify as a "major participant" in a murder. *Ibid.*

The Supreme Court holds that the more an offender participated in the antecedent crimes, the more likely he was a major participant in the resulting murder. *Tison*, 481 U.S. at 151–52. In *Tison*, three brothers broke their father and his cellmate out of prison. *Id.* at 139. The brothers entered the prison with a chest full of guns, locked the guards in a storage closet, and escaped with the prisoners, fleeing the grounds in their car. *Ibid.* After the Tisons changed vehicles, their getaway car blew a tire, requiring them to pull off to the side of the road and flag down another car for help. *Id.* at 139–40.

The Tisons managed to flag down a car, which they later stole, and kidnapped the family of four occupants. *Id.* at 140. After kidnapping the family, the Tisons drove them into the desert, where the father and the cellmate killed them. *Id.* at 140–41. The three brothers watched the killings and did not intervene. *Id.* at 141. The police eventually stopped the group at a roadblock. *Ibid.* One of the brothers was killed in a shootout, and the father escaped into the desert where he died from exposure. *Ibid.* The remaining three defendants were convicted of capital murder of the four victims and of the associated crimes of armed robbery, kidnapping, and car theft. *Id.* at 141–42

The Supreme Court held that the brothers' actions leading up to the murder—specifically their significant involvement in the antecedent crimes—made them major participants in the family's murder: the brothers brought the guns to the prison, armed the escapees, fully participated in the kidnapping and robbery, passively watched the killings, and aided the killers in their continuing criminal endeavors. *Id.* at 151–52.

Just as with the brothers in *Tison*, here, there is sufficient evidence to conclude that Owen was a major participant in Dyer's murder. His significant participation and culpability are similar to those of the *Tison* and *Ajabu* defendants: he actively participated in the antecedent crimes leading to Dyer's murder; confined her against her will; interrogated her;

gave the order to "make her go to sleep"; did not intervene as he watched Angulo choke Dyer and slit her throat; and led the effort in covering up the crime. These actions easily satisfy subsection 9(b)(1)'s *actus reus* requirement. *Ajabu*, 693 N.E.2d at 939. Based on these circumstances, the jury was entitled to find that Owen was a major participant in Dyer's murder. Thus, we affirm Owen's conviction for murder.

2

Under Indiana Code section 35-50-2-9(a), the state may seek a life-without-parole sentence for murder by proving beyond a reasonable doubt the existence of at least one aggravating circumstance listed in subsection 9(b). The LWOP-eligible circumstances include committing the murder while also committing or attempting to commit criminal organization activity, I.C. § 35-50-2-9(b)(1)(I), or doing so while under the custody of a county sheriff, *id.* § 35-50-2-9(b)(9)(B). Our standard for reviewing the sufficiency of the evidence to support a statutory sentencing aggravator is the same standard for assessing the sufficiency of the evidence to convict—an abuse of discretion. *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021) (citing *Washington*, 808 N.E.2d at 626).

a

We begin with the criminal-organization aggravator. It is an aggravating circumstance if the defendant "commit[s] a felony or misdemeanor that would cause a reasonable person to believe results in a benefit to a criminal organization or a member of [that] criminal organization; the promotion of a criminal organization; or furthering the interests of a criminal organization". I.C. § 35-45-9-3(a), (c)(1).

For starters, it is undisputed that the Latin Kings are a criminal organization. There is ample evidence that Owen, Murzynski, and Angulo were affiliated with the Latin Kings. All three claimed to be members of the Latin Kings. And Porter saw Owen and Murzynski perform the Latin Kings handshake while he was in the kitchen with them.

Likewise, there is specific evidence that Dyer's confinement was related to the Latin Kings. Murzynski claimed the decision to hold Dyer was a "big Latin King thing", and they feared Dyer would go to the police

if she were released. Talking to law enforcement is a "cardinal sin" to the Latin Kings. Dyer's notebook contained the names of people who were at the house, some of whom were members of the Latin Kings. And her captors specifically asked her why those names were in her notebook.

Owen's behavior at the house also connected the killing to the Latin Kings. He "tagged" the basement after Dyer's death, spraying his name, "King Duke", and other Latin Kings symbols on the walls. The State's expert witness, Lieutenant Kyle Dombrowski, explained the paint's color, the name "King Duke", and the crown symbol were all "particularly associated" with the Latin Kings. The purpose of this "tagging" was "to broadcast that association . . . for the organization itself." It is done to "promote themselves, to sponsor oneself, to further the interest." By tying the murder of an alleged snitch to the Latin Kings, Owen was seeking to "further the interest" of the Latin Kings by celebrating its triumph over a threat to its members, or so a reasonable jury could find. The evidence was sufficient to show that Owen's directive to murder Dyer furthered the interests of the Latin Kings and satisfied the criminal-organization aggravator.

b

Next, we consider the under-custody aggravator. It is an aggravating circumstance if the "defendant committed the murder by intentionally killing the victim while [the defendant was] . . . under the custody of the county sheriff". I.C. § 35-50-2-9(b)(9)(B). It is undisputed that Owen was under the custody of the county sheriff at the time of Dyer's murder. Julie Koets, who worked with Michiana Community Corrections, testified that during October 2019, Owen was serving a sentence for unrelated crimes through the Elkhart County Jail, which is controlled by the Elkhart County sheriff. At the time, Owen was on in-home detention through the local community corrections. He did not challenge this aggravating factor in his appellate briefing and thus has waived any argument it does not apply. *Isom v. State*, 170 N.E.3d 623, 645 (Ind. 2021) (citing Appellate Rule 46(A)(8)(a)) (concluding that failure to raise argument on appeal resulted in waiver)).

A jury could reasonably find that Owen murdered Dyer both to further the interests of the Latin Kings and while he was under the custody of the county sheriff. For both reasons, we hold there was sufficient evidence for the jury to recommend—and the trial court to impose—a life-without-parole sentence.

B

Next, Owen argues that the trial court erred by declining to provide two proposed instructions to the jury. We review a trial court's manner of instructing the jury for an abuse of discretion. *Inman v. State*, 4 N.E.3d 190, 201 (Ind. 2014) (citing *Cline v. State*, 726 N.E.2d 1249, 1256 (Ind. 2000)). To determine if a trial court abused its discretion, we consider "(1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given." *Chambers v. State*, 734 N.E.2d 578, 580 (Ind. 2000) (citing *Wooley v. State*, 716 N.E.2d 919, 926 (Ind. 1999)). Jury instructions are to be considered as a whole. *Ibid.* A trial court acts within its discretion if it denies a request that would likely confuse the jury. *Ludy v. State*, 784 N.E.2d 459, 461–62 (Ind. 2003).

Here, the trial court did not abuse its discretion because Owen's proposed instructions could have confused the jury. His first challenged instruction, No. 2, concerned the State's duty to prove Owen was a "major participant". It said:

> … because Indiana Code section 35–50–2–9(b)(1) permits a sentence of life without parole only if the defendant has committed a murder by "intentionally" killing a victim while committing another crime, the State must prove that the defendant was a major participant in the killing and the killing was intentional in order to impose a sentence of life without parole under subsection (b)(1).

The instruction's first confusing element is the ellipsis at the beginning, which could signal to the jury that some context is missing or omitted from the instruction, thus leaving jurors to wonder what else should be

there. In addition, the instruction does not define "major participant". This lack of clarity could have led jurors to believe it meant something narrower and more restrictive than what the law requires, i.e., that a crime's only "major participant" is the person who delivers the fatal blow.

As to the second challenged instruction, No. 7, Owen argues the trial court should have told the jury about the different levels of intent it had to find in the penalty phase ("intentionally" killed Dyer) versus the guilt phase ("knowingly" killed Dyer). This proposed instruction said:

> The burden of proof on the issue of intent changed dramatically during the penalty phase of the trial. In that portion of the trial, the State was required to prove (the defendant) had the intent to kill, Ind. Code § 35-50-2-9(b)(1)(G); (the defendant's) confederate's intent could not be imputed to (the defendant).

The trial court declined to give this instruction, in part, because "the proposed instruction[] [was] already part of the cumulative instructions, which the Court [was going to] give on phase II of the trial." In instruction No. 4, the trial court recited the statute explaining that before recommending a sentence of life without parole, the jury must find Owen "committed the murder by aiding, inducing, or causing the intentional killing of the victim". Later, in instruction No. 6, the trial court defined both "Knowingly" and "Intentionally":

DEFINITIONS

> KNOWINGLY is defined as: A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of high probability that he is doing so.

> INTENTIONALLY is defined as: A person engages in conduct intentionally if, when he engages in the conduct, it is his conscious objective to do so.

Based on these two instructions—Nos. 4 and 6, which the jury actually heard, and which, along with the other given instructions, are to be "considered as a whole", *Chambers*, 734 N.E.2d at 580—the jury had all the

information it needed under Indiana law to make a life-without-parole recommendation.

Further, the trial court also could have concluded that instruction No. 7 was confusing. This instruction was taken directly from *Landress v. State*, 600 N.E.2d 938, 940 (Ind. 1992). Although trial courts may use language from appellate opinions to instruct a jury, the "mere fact that certain language or expression [is] used in the opinions of this Court to reach its final conclusion does not make it proper language for instructions to a jury." *Ludy*, 784 N.E.2d at 462 (brackets in original) (quoting *Drollinger v. State*, 408 N.E.2d 1228, 1241 (Ind. 1980)). Extracting specific language from a judicial opinion out of context can confuse the jury. *Ibid.* Jury instructions are meant to be neutral statements of the law. The trial court's definitional instruction (No. 6) did a better job than proposed instruction No. 7 of telling the jurors evenhandedly the differences between "knowingly" and "intentionally".

For these reasons, we hold the trial court did not abuse its discretion in choosing not to instruct the jury as Owen proposed.

C

Lastly, concerning his non-murder convictions, Owen argues the trial court relied on several aggravating factors not supported by the record. Specifically, he argues there was insufficient evidence that (1) he was involved in beating and torturing Dyer for being a snitch; (2) he allowed Dyer to have her head shaved, to be treated in a demeaning manner, to be waterboarded, and to be duct-taped; and (3) he was present when Dyer was strangled and killed.

Sentencing decisions are within the "sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion." *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007) (citing *Smallwood v. State*, 773 N.E.2d 259, 263 (Ind. 2002)). "An abuse of discretion occurs if the decision is 'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Ibid.* (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)). A court does not abuse its discretion if the record supports its reasons for

imposing a sentence and those reasons are proper as a matter of law. *Id.* at 490–91.

As for Owen's claim that he had nothing to do with Dyer's torture, the record shows it happened on his watch and under his supervision. Owen was the "boss"; he was "holding court"; and when he arrived at the house, the action stopped. The trial court was allowed to consider all the circumstances surrounding Dyer's unlawful confinement, mistreatment, and eventual death, and these included Owen's role in them. *Bradley v. State*, 770 N.E.2d 382, 388 (Ind. Ct. App. 2002) ("Indiana Code § 35-38-1-7.1 . . . requires the trial court to consider the nature and circumstances of the crime committed in imposing a sentence.") (footnote omitted). This same rationale applies to Owen's claim that he had nothing to do with the demeaning treatment of Dyer (i.e., head shaved, waterboarded, duct-taped). Moreover, the record shows Owen was in the basement both when Angulo attempted to strangle Dyer and when he slit her throat and that Owen did nothing to stop Angulo from doing these things. Thus, the record supports the trial court's consideration and application of these aggravating factors.

But even were Owen right about one or more of these aggravators, any such error would not warrant resentencing him. In *McDonald v. State*, we held that when a defendant challenges some, but not all, of the aggravating circumstances found by the trial court, we will not remand for resentencing if we can say with confidence the trial court would have imposed the same sentence had it not considered the purportedly erroneous aggravators. 868 N.E.2d 1111, 1114 (Ind. 2007). Specifically, we noted in *McDonald* that "in imposing sentence the trial court declared any one of the aggravating circumstances taken alone or in conjunction with others substantially outweigh all of the mitigating circumstances considered as a whole." *Ibid.* (internal quotation marks and citation omitted). There, we held the record was clear that the trial court "would have imposed the same sentence without regard to the challenged aggravators." *Ibid.*

Here, Owen challenges some, but not all, of the aggravating factors found by the trial court. At sentencing, the trial court said: "With respect

to Counts II, III and IV, the Court finds that the aggravators taken **alone or in conjunction with the others** would warrant the imposition of an enhanced sentence." Thus, even if Owen were correct that the judge improperly found some aggravators to be present, the record is clear that the trial court "would have imposed the same sentence without regard to [the] challenged aggravators." *McDonald*, 868 N.E.2d at 1114.

We hold the trial court did not abuse its discretion in sentencing Owen with respect to his other, non-murder offenses.

\*　　\*　　\*

For all these reasons, we affirm the trial court's judgment.

Rush, C.J., and Massa, Goff, and Molter, JJ., concur.

ATTORNEY FOR APPELLANT DONALD R. OWEN, JR.
Marielena Duerring
Duerring Law Offices
South Bend, Indiana

ATTORNEYS FOR APPELLEE STATE OF INDIANA
Theodore E. Rokita
Attorney General of Indiana

Samuel J. Dayton
Evan Matthew Comer
Deputy Attorneys General
Indianapolis, Indiana